ESTATE OF EUGENE E. LA MERES, DECEASED, KATHY KOITHAN, PERSONAL REPRESENTATIVE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6909-88.        Filed March 23, 1992.

*William S. Huff, Charles A. Ramunno, Todd A. Fisher,* and *David R. Child,* for petitioner.

*Frederick J. Lockhart, Jr.,* for respondent.

RUWE, *Judge:* Respondent determined a deficiency in petitioner's Federal estate tax in the amount of $11,786,621,

and additions to tax under section 6651(a)(1)[1] in the amount of $3,718,725, and under section 6651(a)(2) in the amount of $618,326.

The issues for decision are: (1) Whether the split interest charitable provisions of the Eugene E. La Meres Revocable Trust, which were modified by the post-death creation of the La Meres Beta Trust, qualify for an estate tax charitable deduction; (2) assuming that the estate tax charitable deduction is allowable, whether a subsequent adjustment in the funding for the charitable and noncharitable interests increases the allowable estate tax charitable deduction; (3) whether petitioner is liable for an addition to tax under section 6651(a)-(1) for failure to file timely a Federal estate tax return; and (4) whether petitioner is liable for an addition to tax under section 6651(a)(2) for failure to pay timely Federal estate tax.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner is the Estate of Eugene E. La Meres, deceased, Kathy Koithan, personal representative. Decedent, Eugene E. La Meres, was domiciled in Colorado at the time of his death. At the time it filed its petition in this case, petitioner's representative resided in Wheat Ridge, Colorado.

### Charitable Deduction Issues

Decedent, a retired Roman Catholic priest, was actively engaged in the hotel business in California, New Mexico, and Colorado. He owned a 50-percent interest in a partnership that owned 2 hotels, and he owned 10 hotels as a sole proprietor. He also was actively engaged in extensive securities trading. In the years preceding his death, decedent traded between $20 and $50 million worth of stock through five different brokers. On the date of his death, decedent owned $2.6 million worth of stock. In the approximately 10 years

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect as of the date of decedent's death, Apr. 7, 1983, and all Rule references are to the Tax Court Rules of Practice and Procedure.

before his death, decedent accumulated assets having a value of approximately $25 million net of liabilities.

On December 20, 1982, decedent executed his last will and testament (the will). On the same day, decedent executed a revocable trust agreement, creating a trust known as the Eugene E. La Meres Revocable Trust (the revocable trust). Decedent also funded the revocable trust by transferring all his right, title, and interest in the Lamplighter Motel in Anaheim, California; the Downtown Quality Inn in Albuquerque, New Mexico; and the Best Western Rio Grande Motel in Albuquerque, New Mexico, to the trust. Neither the will nor the revocable trust was revoked or amended prior to decedent's death on April 7, 1983.

Decedent died testate, and pursuant to the will, the residue of his estate was transferred to the revocable trust. Articles VII and VIII of the revocable trust agreement provided for the distribution of corpus and income of the revocable trust upon decedent's death as follows:

ARTICLE VII
PAYMENTS AND DISTRIBUTIONS ON SETTLOR'S DEATH

7.01 *Debts and Death Taxes.* On Settlor's death, to the extent the trust estate holds United States treasury bonds eligible for redemption at par in payment of the federal estate tax, Trustee shall pay the federal estate tax redemption, to the extent necessary, in payment of such tax. In addition, Trustee may, but shall not be obligated to, pay directly or pay to Settlor's personal representative all expenses of administration, the expenses of Settlor's last illness and funeral, Settlor's debts, and the balance of any death taxes payable by reason of Settlor's death, as Settlor's personal representative shall direct, and if there is no personal representative of Settlor's estate, as Trustee determines, all without contribution from any person and without appointment. No payments under this Section 7.01 shall be made from assets not includable in Settlor's gross estate for federal estate tax purposes.

7.02 *Tangible Personal Property.* Any items of tangible personal property held by Trustee at Settlor's death, other than items of tangible personal property which are held by Trustee and which are used in any lawful business operations of Settlor, shall be distributed in accordance with Article III of Settlor's last will and testament executed December 20, 1982 * * *.

7.03 *Special Distribution.* On Settlor's death, Trustee shall pay from the income and/or principal of the trust estate the sum of One Hundred Thousand Dollars ($100,000.00) to those Missions of the Roman Catholic Church of the United States, that Trustee shall determine * * *.

7.04 *Residence.* On Settlor's death, if Settlor is survived by MARLENE LINN of Arvada, Colorado, Trustee shall distribute to her any interest then

held by the Trust in any real property occupied by Settlor as his principal residence at the time of his death, including any insurance policies and claims under such policies on such property.

7.05 *Quality Inn.* On Settlor's death, if EDWARD BRABSON of Albuquerque, New Mexico, is then employed by Settlor or any entity primarily owned by Settlor, Trustee shall distribute to him the undivided ownership interest in * * * the motel business known as the Downtown Quality Inn, Albuquerque, New Mexico. The undivided ownership interest to be distributed shall be a full three percent (3%) (of 100%) for each calendar year or fraction thereof from July 1, 1982 to the date of Settlor's death, provided that no more than an undivided fifty percent (50%) interest shall be distributed. * * *

## ARTICLE VIII
### DISPOSITION AFTER DEATH OF SETTLOR

8.01 *Principal.* Upon Settlor's death the then remaining principal and any accumulated income of the trust estate and any property added to the trust estate by Settlor's will, except as otherwise provided in Article VII, Article XIII, or Section 8.02, shall be held in perpetuity by Trustee and the income therefrom shall be distributed as provided in this Article.

8.02 *Quality Inn.* Commencing the year following the year of Settlor's death, Trustee shall distribute annually to EDWARD BRABSON of Albuquerque, New Mexico, from the principal of the trust estate, the undivided ownership interest * * * in * * * the motel business known as the Downtown Quality Inn, Albuquerque, New Mexico. The undivided ownership interests to be distributed shall be a full three percent (3%) (of 100%) per year, provided that such distributions shall cease for any year following the year EDWARD BRABSON ceases * * * to act as chief operating officer for the hotels and motels held as part of the trust estate pursuant to Section 11.09, and further provided that no more than an undivided fifty percent (50%) interest, in the aggregate, shall be distributed pursuant to this Section and Section 7.05. * * *

8.03 *Income Distributions After Settlor's Death.* After the death of the Settlor, the Trustee shall pay * * * the following individuals or organizations[2] the respective amounts of the net income of the trust estate set forth below:

A. To see (sic) REVEREND JOHN KUHN, * * * Five Thousand ($5,000.00) per year for the five (5) years commencing with the year following the year of Settlor's death. If, however, Reverend Kuhn dies prior to the expiration of said five (5) year period, this distribution shall cease for any year following the year of his death.

B. To LOUISE JOB, * * * Five Thousand Dollars ($5,000.00) per year for the five (5) years commencing with the year following the year of Settlor's death. If, however, Louise Job dies prior to the expiration of said five (5)

---

[2]For convenience; we will refer to the beneficiaries which qualify as charitable entities under sec. 2055(a) as "the institutional beneficiaries", and we will refer to all other beneficiaries as "the individual beneficiaries".

year period, this distribution shall cease for any year following the year of her death.

C. Settlor's sister, PATRICIA SOKOLOSKI, * * * the sum of Seven Thousand Dollars ($7,000.00) per year for the remainder of her life, commencing with the year following the year of Settlor's death. The foregoing distributions to Patricia Sokoloski shall be subject to annual increase as provided in Section 9.03.

D. To MR. & MRS. GERHART LINN, * * * the sum of Five Thousand Dollars ($5,000.00) per year for the joint lives of Mr. & Mrs. Linn, said distributions to commence in the year following the year of Settlor's death. The foregoing distributions to Mr. & Mrs. Linn shall be subject to annual increase as provided in Section 9.03.

E. To Settlor's nephew, KENNETH SOKOLOSKI, * * * the sum of Five Thousand Dollars ($5,000.00) per year for the five (5) years commencing with the year following the year of Settlor's death. If, however, Kenneth Sokoloski dies prior to the expiration of said five (5) year period, no distribution shall be made for any year following the year of his death.

F. To the following individuals who are currently employees of Settlor, if they are employees of Settlor or any business primarily owned by Settlor at the date of his death, Trustee shall distribute to them the sum of Five Thousand Dollars ($5,000.00) each, per year, for the five (5) years commencing with the year following the year of Settlor's death. * * *

1. KATHY KOITHAN * * *
2. INA DAY * * *

G. To MARLENE LINN, * * * Fifty Thousand Dollars, ($50,000.00) per year for the remainder of her life commencing in the year following the year of Settlor's death; provided, however, that if Marlene Linn should marry, then Trustee shall be required to distribute to her only the sum of Twenty-Five Thousand ($25,000.00) per year. * * * The amount of the foregoing distributions shall be subject to annual increase as provided in Section 9.03.

H. To ST. MARY'S CHURCH, * * * the sum of Fifty Thousand Dollars ($50,000) per year for the ten (10) years commencing with the year following the year of Settlor's death.

I. To the daughter KAREN, of Settlor's sister Patricia Sokoloski, the sum of Five Thousand Dollars ($5,000) per year for the five (5) years commencing with the year following the year of Settlor's death; provided, however, that if Karen dies prior to the expiration of said five (5) year period, no distribution shall be made for any year following the year of her death.

J. To KEN BAXTER, * * * the sum of Five Thousand Dollars ($5,000) per year for the five (5) years commencing with the year following the year of Settlor's death; provided, however, Ken Baxter dies prior to the expiration of said five (5) year period, no distribution shall be made for any year following the year of his death.

K. To MR. AND MRS. EDWARD RAGASOL, * * * or the survivor of them, the sum of Five Thousand Dollars ($5,000) per year for the five (5) years commencing with the year following the year of Settlor's death; provided, however, that if both Mr. and Mrs. Ragasol die prior to the expiration of said five (5) year period, no distribution shall be made for any year following the year of the death of the survivor of them.

L. If for any year net trust income remains after the distributions set forth in Paragraph A through K above, the remaining trust income shall be distributed to those organizations and in the proportions specified in Section 8.05.

8.04 *Reduction in Income Distributions.* In the event net trust income for any year is insufficient for the entire amount of all distributions set forth in Section 8.03, Trustee shall reduce income distributions for that year to all beneficiaries named in Section 8.03 pro rata, based on the relative required distributions set forth in Section 8.03.

8.05 *Perpetual Income Distributions.* After Settlor's death and after the distributions of trust income provided for in Section 8.03, Trustee shall distribute to or apply for the benefit of the following organizations the remaining net income of the trust estate in the percentages set forth below for each such charity:

A. To the CARMELITE CONVENT, * * * thirteen percent (13%), one-half (½) of which is to be used to help finance and build a new Carmelite Convent in New Mexico or Colorado;

B. To ST. MARY'S SCHOOL, * * * ten percent (10%);

C. To the MISSIONARIES OF CHARITY OF MOTHER THERESA, * * * twenty percent (20%);

D. To OBLATES OF MARY (OMI) RELIGIOUS ORDER, ten percent (10%) to be used for their missions in Mexico;

E. To the COLUMBIAN FATHER'S AT ST. COLUMBIANS, * * * ten percent (10%) for their foreign missions;

F. To ST. ELIZABETH CHURCH AND MISSIONS, * * * ten percent (10%);

G. To the LATIN ARCHDIOCESE, * * * ten percent (10%);

H. To the DIOCESE OF GALLUP, * * * ten percent (10%) for their seminary;

I. To the MISSIONARIES OF THE SACRED HEART IN THE DIOCESE * * * five percent (5%);

J. To the ARCHDIOCESE OF DENVER, * * * two percent (2%) for the propagation of faith for work with Mexican people of the Denver Archdiocese.

During decedent's life, decedent was sole trustee of the revocable trust. Following decedent's death, Kathy Koithan, Ina Day, and Edward Brabson became cotrustees of the revocable trust. Ms. Koithan and Ms. Day were employees of decedent in his hotel businesses, and both have acted as trustees of the revocable trust continuously since decedent's death. Mr. Brabson was the manager of the Quality Inn in Albuquerque, New Mexico, a hotel owned by decedent. Mr. Brabson acted as a cotrustee of the revocable trust until his resignation on March 30, 1984. Pursuant to the revocable trust agreement, in April 1984, Ned Husman became a successor cotrustee to Mr. Brabson. Mr. Husman is a certified public accountant who prepared income tax returns for

decedent for several years prior to his death. Mr. Husman has acted as cotrustee of the revocable trust continuously since April 1984.

On March 30, 1984, after Mr. Brabson's resignation as cotrustee, Ms. Koithan and Ms. Day, as trustees of the revocable trust, executed a resolution of trustees (the Beta resolution) resolving to create a separate trust to be known as the La Meres Beta Trust (the Beta trust). The Beta resolution provides in pertinent part:

1. The Trustees hereby irrevocably resolve to transfer * * * trust property * * * from the [revocable trust] to a separate trust [the Beta trust] benefitting the individual beneficiaries * * *.

*    *    *    *    *    *    *

3. The [Beta trust] shall provide that trust income in excess of that required for the payment to the individuals shall be paid to the Institutional Beneficiaries. * * *

4. The [Beta trust] shall be deemed to have been established as of the date of [decedent's] death.

5. The Trustees hereby irrevocably resolve that the individual beneficiaries shall have no right, title or interest in any trust property except that property which is transferred to the La Meres Beta Trust.

6. The Trustees hereby irrevocably resolve that the Institutional Beneficiaries shall be the sole and exclusive beneficiaries of the Revocable Trust effective as of the deemed establishment of the [Beta trust]. The Revocable Trust shall be held, administered and distributed in accordance with the terms of Sections 7.01, 8.03(H), 8.05 and Articles IX through XVI of the Revocable Trust. No other provisions of the Revocable Trust shall be applicable to the property in the Revocable Trust.

7. The [Beta trust] shall be held, administered and disposed of in accordance with all of the terms described in Sections 5.04, 7.01, 7.03, and Articles VIII and XVI of the Revocable Trust except Sections 8.02 and 8.03(H) thereof.

On March 30, 1984, pursuant to the Beta resolution, Ms. Koithan and Ms. Day executed a trust agreement (the Beta trust agreement), creating the Beta trust, with Ms. Koithan, Ms. Day, and Mr. Husman acting as trustees of the Beta trust. The Beta trust agreement provided for: (1) Certain outright payments and distributions of principal on decedent's death; (2) the payment of all Federal and State death taxes; and (3) the payment of certain annual payments to individual beneficiaries after decedent's death. The annual payments to the individual beneficiaries specified in the Beta trust agreement were the same as those annual payments that were to be made

pursuant to Article VIII (except sections 8.02 and 8.03(H) thereof) of the revocable trust. These annual payments were to be made pursuant to Article VII of the Beta trust agreement as follows:

(a) To eight individuals, $5,000 each per year until the earlier of five years or the individual's death.

(b) To Patricia Sokoloski, $7,000 per year for life, subject to increase by reference to the Consumer Price Index (the CPI).

(c) To Mr. and Mrs. Gerhart Linn, $5,000 per year for their joint lives, subject to increase by reference to the CPI.

(d) To Marlene Linn, $50,000 per year for life, subject to increase by reference to the CPI, with a reduction to $25,000 per year if she should marry unless the trustee determines that up to $50,000 per year was necessary for her health, support, and maintenance.[3]

The trustees determined that funding in the amount of $7,663,504 was necessary to fulfill the purposes of the Beta trust. This amount was based on the assumption that the following amounts would be required to fulfill the various purposes of the Beta trust as follows:

(a) Funding of annual payments ............... [1]$3,551,000
(b) Outright distributions
    (1) Repurchase of 9-percent interest
       in Quality Inn of Albuquerque
       from Ed Brabson ................... [2]200,000
    (2) Missions of the Roman Catholic
       Church .......................... [3]100,000
(c) Federal and State death taxes .............. 3,812,504
    Total ................................. 7,663,504

[1]This amount was determined by assuming an annual yield of 7.5 percent on trust corpus and annual distributions to the individual beneficiaries in an amount equal to the maximum allowed under the Beta trust. Determination of the maximum amount of distributions to individual beneficiaries under the Beta trust assumed 4.5 percent annual increases in the CPI. This funding method assumed annual payments of $266,311 for the entire payment period, with the $3,551,000 of principal remaining intact at the end of the payment period. However, the actual amount of annual payments during the payment period was generally far less than $266,311. For this reason, at the end of the payment period there was substantial unused income generated by the $3,551,000 of principal.

---

[3]Instruments executed by the beneficiaries identified in items (b), (c), and (d) above, purport to limit the annual increases in the annual payments described in these items to 4.5 percent.

The amount necessary to fund the annual payments, if funded by the purchase of annuity contracts, would have been approximately $1,500,000. This amount is based on actuarial calculations using a sinking-fund concept and has been confirmed by an insurance company.

[2]This amount was not a bequest, but rather represented funds of the estate needed for the post date-of-death property acquisition of Mr. Brabson's interest in the Quality Inn of Albuquerque.

[3]This amount was paid in accordance with decedent's intent, as expressed in the original governing instruments. If petitioner had paid this amount in accordance with these instruments, it could have reported it as a charitable contribution giving rise to a deduction. Respondent concedes that petitioner is entitled to a charitable deduction with respect to this $100,000 distribution.

The trustees transferred approximately $7,360,007 in cash and property to the Beta trust. The trustees anticipated that appreciation of the assets in the Beta trust would make up the difference between the amount transferred and the amount initially determined for funding. This method of funding the Beta trust was the mathematical (and estate tax) equivalent of funding the Beta trust with only sufficient assets necessary to fund the annual payments and causing death taxes to be paid out of the assets of the revocable trust.

On April 18, 1989, the trustees of the revocable trust and the Beta trust petitioned the Probate Court in and for the City and County of Denver, State of Colorado.[4] In their petition, the trustees requested the Probate Court to make certain findings and issue instructions with respect to the creation and funding of the Beta trust. On April 20, 1989, the State Probate Court issued an order stating that pursuant to the terms of the revocable trust: (1) "Not only did the [trustees] have express power by the terms of the * * * revocable trust to create a separate trust such as the Beta trust, but they also had a duty to create such a trust, since otherwise decedent's estate apparently would not be entitled to a federal estate tax charitable deduction because of 2055(e) of the internal revenue code;" (2) the trustees of the revocable trust and the Beta trust have the authority to purchase annuity contracts with which to satisfy the annual payments and, indeed, have a duty to the charitable beneficiaries of the revocable trust to do so; and (3)

[4]The petition to the Probate Court was filed over 15 months after respondent issued a statutory notice of deficiency to petitioner.

because of the foregoing findings, the trustees of the revocable trust and the Beta trust may reduce the inadvertent overfunding of the Beta trust and have a duty to the charitable beneficiaries of the revocable trust to do so. The Probate Court also found that the creation of the Beta trust was effective as of the date of decedent's death.[5]

Following the issuance of the Probate Court order, the trustees of the revocable trust and the Beta trust executed a resolution of trustees in which they resolved, effective as of the date of decedent's death, to reduce the funding of the Beta trust to approximately $1,500,000 to fund the annual payments to the individual beneficiaries.

On its U.S. Estate Tax Return (Form 706), petitioner claimed a charitable deduction in the amount of $18,528,622. The claimed charitable contribution deduction consisted of the following items, which were disclosed on Schedule O of the Federal estate tax return:

| Beneficiary | Amount |
| --- | --- |
| Carmelite Convent | $2,343,721 |
| Missionaries of the Charity of Mother Theresa of Calcutta, India | 3,605,724 |
| Oblates of Mary Religious Order | 1,802,862 |
| Columbian Fathers at St. Columbians | 1,802,862 |
| St. Elizabeth Church and Missions | 1,802,862 |
| Latin Archdiocese | 1,802,862 |
| Diocese of Gallup | 1,802,862 |
| Missionaries of the Sacred Heart in the Diocese of Ambon, Indonesia | 901,432 |
| Archdiocese of Denver | 360,573 |
| St. Mary's School of New England, North Dakota | 1,802,862 |
| St. Mary's Church of New England, North Dakota | 500,000 |
| Total | 18,528,622 |

On January 7, 1988, respondent issued a statutory notice of deficiency. Respondent disallowed petitioner's claimed chari-

---

[5]The parties have stipulated that the Probate Court had jurisdiction over the trustees of the revocable trust and the Beta trust and subject matter jurisdiction with respect to all matters relating to the internal affairs of those trusts. Respondent stipulated that the Court's order "confirmed [the trustees' actions] * * * pursuant to the terms of the Revocable Trust and Colorado trust law." However, respondent also stated that she did not waive her right to contest the application of Colorado law to these issues. In light of this, we do not find, as a fact, that the trustees' acts were proper under Colorado law.

table deduction and increased the taxable estate in the amount of $18,528,622.

*Additions to Tax Issues*

On April 13, 1983, decedent's last will and testament was admitted to probate by the District Court in Jefferson County, Colorado. Pursuant to the will, Ms. Koithan was appointed as sole personal representative of decedent's estate. Since her appointment, Ms. Koithan has acted continuously in this capacity. Following her appointment, Ms. Koithan retained the Denver law firm of Calkins, Kramer, Grimshaw & Harring as counsel to the estate. The trustees of the revocable trust also retained Calkins, Kramer, Grimshaw & Harring as counsel to the revocable trust. John J. Tipton, then a partner in Calkins, Kramer, Grimshaw & Harring, was the attorney in charge of advising the estate and the revocable trust. Mr. Tipton was a highly qualified and experienced estate planning and administration practitioner, having previously filed over 100 estate tax returns. He took the lead in research and resolution of any estate tax matter and other legal issues arising with respect to administration of the estate. Ms. Koithan relied on Mr. Tipton's advice with respect to the filing of the return and other legal matters as to which she, as a lay person, had little or no experience or knowledge.

Mr. Husman was cotrustee for the revocable trust and also the estate's accountant. Mr. Husman did not have any previous experience with preparation or filing of estate tax returns. However, due to his previous work on decedent's personal income tax returns, Mr. Husman was familiar with decedent's business affairs. Mr. Husman was responsible for compiling data for the estate tax return and drafting the return for review and approval by Mr. Tipton before filing.

Decedent's estate was extremely complex. It was comprised of assets which had to be located and valued. Mr. Tipton oversaw the collection of data necessary for preparing decedent's estate tax return and was in charge of reviewing the return prior to filing.

When the original due date for decedent's estate tax return (January 9, 1984) approached and the appraisals were not completed, Ms. Koithan sought Mr. Tipton's advice. Mr. Tipton advised her to request a 6-month extension of time in

which to file the estate tax return under section 6081 and a 1-year extension of time in which to pay the estate tax shown on the return under section 6161. Accordingly, Ms. Koithan, on behalf of petitioner, timely filed a Form 4768 combined Application for Extension of Time to File U.S. Estate Tax Return and/or Pay Estate Tax. Petitioner requested an extension of time to file until July 7, 1984, and an extension of time in which to pay the estate tax until January 7, 1985. Petitioner's check in the amount of $20,000 accompanied the combined application. Although the record does not clearly indicate the date that this first extension was filed, the check for $20,000 was dated January 4, 1984, and Mr. Husman's records reflect that the request was signed on January 5, 1984.[6]

Respondent negotiated petitioner's check but did not notify it of whether the requested extensions for filing and paying had been approved. In fact, on or about February 8, 1984, respondent approved the requested extensions of time for filing the decedent's estate tax return and paying the estate tax. However, it was not until respondent audited the decedent's estate tax return in 1986 that respondent actually notified petitioner that she had approved the requested extensions.

When the first extended due date for filing the estate tax return approached, Ms. Koithan had not assembled the information necessary for filing an accurate return. Ms. Koithan again sought Mr. Tipton's advice, and Mr. Tipton advised Ms. Koithan that a second 6-month extension of time in which to file the estate return was available and that the estate should obtain such an extension to allow time to assemble the necessary information for filing an accurate return. Before expiration of the first filing extension period, Ms. Koithan, acting on behalf of petitioner, filed a second application for an extension of time in which to file decedent's estate tax return. The second application requested an extension until January 7, 1985. Petitioner's check in the amount of $50,000 accompanied the second application.

---

[6]Even if respondent had denied petitioner's request after the original due date, respondent apparently would not have treated the return as late until 10 days after the date on which respondent notified petitioner that she denied its request. See Rev. Rul. 64-214, 1964-2 C.B. 472.

Respondent negotiated petitioner's check but did not notify it of whether the second extension had been approved. In fact, respondent did not approve this extension. Respondent did not notify petitioner that the second extension request had been denied until sometime during petitioner's estate tax return audit in 1986.

Petitioner filed its Federal estate tax return on January 10, 1985.[7] On its return, petitioner made an election under section 6166 to defer payment of estate tax. Ms. Koithan believed that petitioner had made a valid election under section 6166, and this belief was confirmed by a letter from the Internal Revenue Service to petitioner dated May 6, 1987. However, respondent's examining estate tax attorney recommended that respondent disallow petitioner's section 6166 election in her audit report dated October 20, 1987.

At the time of trial, respondent had billed petitioner for its estate tax liability and interest based upon the section 6166 election made on petitioner's Federal estate tax return. Petitioner has paid the following amounts of estate tax and interest:

| Date | Payment |
|------|---------|
| 01/12/84 | $20,000.00 |
| 07/10/84 | 50,000.00 |
| 01/10/85 | 388,022.00 |
| 01/07/86 | 347,397.00 |
| 05/15/87 | 303,471.57 |
| 04/26/88 | 24,933.35 |
| 11/16/88 | 80,698.88 |
| 04/07/89 | 8,141.42 |
| Total | 1,222,664.22 |

Due principally to economic decline with respect to the hotel properties and the discontinuation of petitioner's line of credit, in May 1989, the net value of the assets of the revocable trust and Beta trust was approximately $6 million.

---

[7]The estate tax return reflects that it was received by respondent on Jan. 10, 1985. Had respondent granted petitioner's second request for an extension of time in which to file, the return due date would have been Jan. 7, 1985. Under sec. 7502, a timely mailed return is a timely filed return. The return is dated Jan. 7, 1985. While the record does not indicate the date the return was mailed, it appears that the return was mailed on Jan. 7, 1985, the same day it was dated, and respondent has made no argument to the contrary.

OPINION

The first issue for decision is whether the revocable trust, as modified by the Beta resolution, qualifies for the deduction for charitable bequests under section 2055.

Section 2055(a) provides for an estate tax charitable deduction where a bequest is made to or for the use of qualifying charitable organizations.[8] Section 2055(e)(2) provides that when an interest in property passes to a charitable organization and an interest in the same property also passes to a noncharitable beneficiary, the value of the interest passing to the charitable organization qualifies for an estate tax charitable deduction only if it is made in one of three specified forms (namely, an annuity trust, a unitrust, or a pooled income fund). See *Estate of Gillespie v. Commissioner,* 75 T.C. 374, 377-378 (1980); *Estate of Edgar v. Commissioner,* 74 T.C. 983, 987-988 (1980), affd. without published opinion 676 F.2d 685 (3d Cir. 1982). Section 2055(e)(3), however, provides specific relief provisions under which an otherwise nondeductible bequest to charity will be deductible provided the bequest is timely modified by amendment to conform with one of the three qualifying forms of charitable remainder interests specified in section 2055(e)(2)(A). *Estate of Burdick v. Commissioner,* 96 T.C. 168, 170 (1991). Petitioner bears the burden of proving that it is entitled to the deduction for charitable bequests under section 2055. Rule 142(a).

Petitioner does not dispute that the revocable trust, as it existed on the date of decedent's death, did not qualify for the deduction under section 2055 because the trust constituted a nonqualifying split interest under section 2055(e)(2). Petitioner argues, however, that the Beta resolution effectively purged the revocable trust of the noncharitable interests thereby eliminating the split interest. Petitioner points out that the original trust agreement permitted the trustees to make the Beta resolution and that the Probate Court found that the resolution applied retroactively. Thus, according to petitioner, the split-interest rules under section 2055(e)(2) are inapplicable, and the estate is entitled to a deduction for the assets in

---

[8]Respondent has not argued that the beneficiaries of the revocable trust, as modified by the Beta resolution, were not qualified organizations within the meaning of sec. 2055(a).

the revocable trust, as modified by the Beta resolution, under section 2055(a).

Petitioner relies on case law from various jurisdictions to support its argument that the revocable trust, as modified, qualifies for the deduction under section 2055(a). It is true that this Court and others have permitted a deduction under section 2055(a) when the charitable bequest was, as of date of death, a nondeductible split interest under section 2055(e)(2), but because of events subsequent to the date of death, the charitable and noncharitable interests were effectively separated. See *Flanagan v. United States,* 810 F.2d 930, 934 (10th Cir. 1987); *First National Bank of Fayetteville v. United States,* 727 F.2d 741 (8th Cir. 1984); *Oetting v. United States,* 712 F.2d 358 (8th Cir. 1983); *Estate of Thomas v. Commissioner,* T.C. Memo. 1988-295; *Estate of Strock v. United States,* 655 F. Supp. 1334, 1340 (W.D. Pa. 1987); *Northern Trust Co. v. United States,* 41 AFTR 2d 78-1523, 78-1 USTC par. 13,229 (N.D. Ill. 1977). However, all these cases are distinguishable on the basis that nontax considerations provided part of the explanation for the post date-of-death events which separated the charitable and noncharitable interests. As we recently stated:

Where the only apparent reason for termination or modification of an otherwise nonqualifying split-interest charitable bequest is circumvention of the requirements of section 2055(e)(2)(A), an estate tax deduction will not be allowed even for the amount of a direct payment to the charitable organization. [*Estate of Burdick v. Commissioner, supra* at 170.]

The evidence indicates that the Beta resolution was an attempt to qualify the charitable bequests for the deduction under section 2055(a). There is no evidence indicating a nontax reason for the Beta resolution. Under these circumstances, we find that petitioner failed to prove that the Beta trust was modified for reasons independent of tax considerations.

Petitioner argues on brief that there was a fiduciary duty to conserve the trust assets and that this fiduciary duty provides a reason independent of tax considerations for the Beta resolution. We are not persuaded by this argument. In the context of this case, this is not a reason independent of tax considerations. In fact, petitioner's fiduciary duty argument depends entirely on tax consequences. Specifically, it was the estate tax savings resulting from the section 2055 tax deduction which petitioner was attempting to salvage by the

creation of the Beta trust that would provide the means for conserving the trust assets. The conservation of trust assets will always be a reason for attempting to qualify an otherwise nonqualifying split interest by a means other than that prescribed in section 2055(e)(3). If we were to accept it as the nontax reason for the modification to the Beta trust, then we would render superfluous the requirement that nontax reasons provide part of the reason for the modification.

Petitioner's position would also render superfluous the specific relief provisions in section 2055(e)(3). Under section 2055(e)(3), certain nonqualifying, split-interest trusts may be reformed if done so by means specified by that section. If a trustee could simply assert that she was acting pursuant to her fiduciary duty to conserve trust assets and retroactively amend the trust such that the nonqualifying split interest was eliminated, then there would be no reason for satisfying the strict requirements of section 2055(e)(3).[9] We recognize Congress' intent to encourage charitable bequests. See *Flanagan v. United States, supra* at 934; *Estate of Strock v. United States, supra* at 1339. Nonetheless, we must also recognize that Congress provided very specific statutory means for reforming nonqualifying charitable trusts.

Petitioner also argues that courts have permitted retroactive modifications similar to the modification in the instant case, because the modification avoided the abuse which Congress was concerned with when it prohibited the deduction for split-interest trusts. The legislative history indicates that section 2055(e)(2) was enacted to prevent estates from claiming a deduction for the charitable bequest in excess of the value of the property actually received by the charity. See *Flanagan v. United States, supra* at 935; *First National Bank of Fayetteville v. United States, supra* at 748; *Oetting v. United States, supra* at 360; *Estate of Thomas v. Commissioner, supra; Estate of Strock v. United States, supra* at 1336-1337; *Northern Trust Co. v. United States, supra.* Although not explicitly relying on this aspect of the legislative history,[10] these courts have

---

[9]This factual scenario is not unrealistic. Assuming that the tax benefit generated by the deduction could be shared by all trust beneficiaries, it seems quite likely that the trustee could convince the beneficiaries to agree to the modification.

[10]Each of these cases found that post date-of-death modifications of the split-interest charitable bequests were based, at least in part, on nontax reasons.

buttressed their conclusion that a deduction under section 2055(a) was appropriate by noting that this abuse was not present in the case before them. We acknowledge that deductions in excess of amounts actually received by charities were one of the abuses which this legislation addressed; but we cannot ignore the plain reading of section 2055(e)(2) which denies deductions for split-interest charitable remainder trusts unless it is in the form of an annuity trust, a unitrust, or a pooled income fund. See *Estate of Burdick v. Commissioner,* 96 T.C. at 170. Thus, we do not think it appropriate to consider legislative history to determine whether a split-interest bequest is deductible when section 2055(e)(2) clearly provides otherwise. *Estate of Johnson v. United States,* 941 F.2d 1318 (5th Cir. 1991); see *Freytag v. Commissioner,* 501 U.S. ___, 111 S. Ct. 2631, 2636 (1991).

Petitioner also cites three of respondent's revenue rulings in support of its position. Rev. Rul. 89-31, 1989-1 C.B. 277, and Rev. Rul. 78-152, 1978-1 C.B. 296, are easily distinguished from the instant case on the basis that both involved nontax reasons (a will contest and an election by a spouse to take against the will) for the separation of the charitable and noncharitable interests. Rev. Rul. 83-20, 1983-1 C.B. 231, is distinguishable on the basis that the trust involved there qualified for the deduction under section 2055(a) as of date of death. After date of death, decedent's spouse petitioned the local court for an allowance for support. The surviving spouse's petition was granted, and as a result, a nonqualifying split interest was created in the previously qualified charitable bequest. Because of post mortem, non-tax-related events, a noncharitable party obtained an interest in part of the charitable bequest. Consequently, respondent allowed the deduction but only in an amount that the charity was practically certain to actually receive.

Finally, we address the effect of the State court proceeding on this issue. The trustees of the revocable trust and Beta trust petitioned the Probate Court for an order approving their actions pursuant to the Beta resolution. The trustees represented all beneficiaries of the revocable trust, and all the individual beneficiaries consented to the granting of relief requested. Two days later, the Probate Court granted the relief requested, finding that the Beta trust was properly

created under Colorado law and that the creation of the trust was retroactive as of the date of decedent's death. This proceeding was not adversarial.

Under section 20.2055-2(e)(1)(i), Estate Tax Regs., the principles of section 2056 are applied for purposes of determining whether an interest in property has passed from decedent for charitable purposes and an interest in the same property also has passed from the decedent for private purposes. A determination of the nature of the interest which passes under section 2056 is made under the law of the jurisdiction under which the interest passes. *Estate of Bowling v. Commissioner,* 93 T.C. 286, 293 (1989); *Estate of Holland v. Commissioner,* 64 T.C. 499, 503 (1975).

Petitioner's legal position in effect is that under the laws of Colorado, a trustee may retroactively amend a trust, and a State court order confirming that amendment is binding on those who were not parties to the court proceeding and who otherwise had no opportunity to object to the amendment. Petitioner suggests on brief that the Probate Court order indicates the appropriateness of this position. Petitioner cites no Colorado authority which supports this position, and we are unaware of any.[11] Instead, we believe that Colorado would follow the general rule, as articulated by the Tenth Circuit Court of Appeals, that—

as between parties to an instrument a reformation relates back to the date of the instrument, but that as to third parties who have acquired rights under the instrument, the reformation is effective only from the date thereof. [*Sinopoulo v. Jones,* 154 F.2d 648, 650 (10th Cir. 1946); fn. ref. omitted.]

This and other courts have generally disregarded the retroactive effect of State court decrees for Federal tax purposes. See *Van Den Wymelenberg v. United States,* 397 F.2d 443, 445 (7th Cir. 1968); *Straight Trust v. Commissioner,* 245 F.2d 327, 329-330 (8th Cir. 1957), affg. 24 T.C. 69 (1955); *Estate of Nicholson v. Commissioner,* 94 T.C. 666, 673 (1990); *Fono v. Commissioner,* 79 T.C. 680, 695 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); *American Nurseryman*

---

[11]We are aware of Colo. Rev. Stat. Ann. sec. 15-1-1002(3) (West 1981), which allows a trustee to retroactively amend a charitable trust in order to qualify it for a deduction under sec. 2055(e). This section does not apply because the trustees in this case amended the trust to qualify for a deduction under sec. 2055(a), not sec. 2055(e).

*Publishing Co. v. Commissioner,* 75 T.C. 271, 275 (1980), affd. without published opinion 673 F.2d 1333 (7th Cir. 1981). See *Estate of Kraus v. Commissioner,* T.C. Memo. 1988-154, affd. on this issue 875 F.2d 597 (7th Cir. 1989).

We recognize that the revocable trust authorized the trustees to take the actions which they took. However, the actions taken by the trustees split the trust's assets, removed beneficiaries, and created an entirely new legal entity. Clearly, these post-death actions modified or amended the dispositive provisions of the trust.[12] While we will look to local law in order to determine the nature of the interests provided under a trust document, we are not bound to give effect to a local court order which modifies the dispositive provisions of the document after respondent has acquired rights to tax revenues under its terms. *Estate of Nicholson v. Commissioner, supra* at 673; *American Nurseryman Publishing Co. v. Commissioner, supra* at 275; *Estate of Hill v. Commissioner,* 64 T.C. 867, 875-876 (1975), affd. in an unpublished opinion 568 F.2d 1365 (5th Cir. 1978). As the Court of Appeals explained in *Van Den Wymelenberg v. United States, supra* at 445:

Were the law otherwise there would exist considerable opportunity for "collusive" state court actions having the sole purpose of reducing federal tax liabilities. Furthermore, federal tax liabilities would remain unsettled for years after their assessment if state courts and private persons were empowered to retroactively affect the tax consequences of completed transactions and completed tax years.

In conclusion, although the revocable trust, as modified by the Beta resolution, appears to meet the requirements of section 2055(a), we nevertheless find that respondent is entitled to estate taxes on the basis of the trust's dispositive provisions that existed at the time of decedent's death. *Estate of Nicholson v. Commissioner, supra* at 680. Petitioner's attempt to qualify for the section 2055(a) deduction by execution of the Beta resolution and obtaining the court order of April 20, 1989, fails.

After reviewing the entire record, we find that the revocable trust was a nonqualifying split interest under section 2055(e)-(2) and, therefore, does not qualify for the deduction for

---

[12]See 89 C.J.S., Trusts, sec. 87 (1991).

charitable bequests. We also find that the Beta resolution had no nontax purpose and, therefore, does not qualify the revocable trust for the deduction under section 2055(a). Accordingly, we hold for respondent on this issue. Because we hold for respondent on this issue, we need not reach the issue of whether the subsequent reduction of the Beta trust's funding and corresponding increase in the revocable trust's funding entitled the estate to a deduction for charitable bequests in excess of that claimed on its return.

The second issue for decision is whether petitioner is liable for an addition to tax under section 6651(a)(1) for failure to file timely its Federal estate tax return. Petitioner concedes that, under section 20.6081-1(a), Estate Tax Regs., it was not entitled to the second 6-month extension of time to file its estate tax return, and that, therefore, the estate tax return was not timely filed. However, petitioner argues that it is not subject to the section 6651(a)(1) addition to tax because it relied on its attorney's erroneous advice that it could obtain the second 6-month extension which it requested, and that reliance on this advice constitutes reasonable cause for failure to file timely its estate tax return.

The addition to tax under section 6651(a)(1) does not apply if the failure to file is due to "reasonable cause and not due to willful neglect".[13] Sec. 6651(a)(1); *United States v. Boyle,* 469 U.S. 241, 245 (1985); *Jackson v. Commissioner,* 864 F.2d 1521, 1527 (10th Cir 1989); *Crocker v. Commissioner,* 92 T.C. 899, 912 (1989). Respondent contends that reliance on advice of counsel with respect to a return due date, no matter how reasonable, does not constitute reasonable cause for purposes of section 6651(a)(1). Respondent also argues that petitioner's reliance on advice from its attorney was not reasonable because Ms. Koithan should have known that the advice was erroneous and should have conducted independent research to verify it.

A failure to file timely a return is due to "reasonable cause" if the taxpayer exercised ordinary business care and prudence and was nevertheless unable to file the return within the date prescribed by law. Sec. 301.6651-1(c)(1), Proced. & Admin.

---

[13]Respondent does not argue that petitioner's failure to file timely was due to willful neglect.

Regs.; *United States v. Boyle, supra* at 246; *Bank of the West v. Commissioner,* 93 T.C. 462, 471 (1989); *Estate of Paxton v. Commissioner,* 86 T.C. 785, 819 (1986). When a taxpayer shows that he reasonably relied on the "advice" of an accountant or attorney, even when such advice turned out to be mistaken, courts have frequently held that such reliance constitutes "reasonable cause". Such reliance is consistent with the "ordinary business care and prudence" required by section 301.6651-1(c)(1), Proced. & Admin. Regs.; *Jackson v. Commissioner,* 864 F.2d 1521, 1527 (10th Cir. 1989). See *Denenburg v. United States,* 920 F.2d 301, 303 (5th Cir. 1991).

The leading case on whether reliance on an agent constitutes reasonable cause is *United States v. Boyle, supra.* In *Boyle,* the executor of an estate relied upon an attorney to prepare and file the estate tax return. However, due to a clerical oversight, the attorney filed the estate tax return 3 months late. *United States v. Boyle, supra* at 243. The executor argued that his reliance on the attorney to file the return constituted "reasonable cause" for failure to file timely. *United States v. Boyle, supra* at 244. The Supreme Court held that reliance on an agent to actually file a return, no matter how reasonable, will not, as a matter of law, constitute reasonable cause for a late filing under section 6651(a)(1).[14] The Supreme Court stated:

Congress has placed the burden of prompt filing on the executor, not on some agent or employee of the executor. * * * That the attorney, as the executor's agent, was expected to attend to the matter does not relieve the principal of his duty to comply with the statute. [469 U.S. at 249-250.]

The facts in *Boyle* are distinguishable from the instant case because Ms. Koithan relied on the attorney's erroneous advice that the estate could obtain a second extension for filing its return. She did not rely on the attorney to actually file the return or the requests for extension of time to file. By contrast, the taxpayer in *Boyle* relied on its attorney to actually perform what the Supreme Court described as "an unambiguous, precisely defined duty to file the return within nine months". *Boyle v. United States, supra* at 250. The

---

[14]A determination of which elements must be present to constitute reasonable cause is a question of law. Whether the elements that constitute reasonable cause are actually present in a given situation is a question of fact. *United States v. Boyle,* 469 U.S. 241, 249 n.8 (1985).

Supreme Court acknowledged the legitimacy of this distinction when it stated that "This case is not one in which a taxpayer has relied on the erroneous advice of counsel concerning a question of law." *United States v. Boyle, supra* at 250.[15] Thus, although *Boyle* is not directly on point, it does suggest that reliance on an expert for advice on when the law requires a return to be filed (as opposed to reliance on an agent to fulfill an unambiguous, nondelegable duty) may constitute reasonable cause.[16]

This Court, as well as others, has addressed the issue of whether reliance on an agent constitutes reasonable cause for failure to file timely a return. Many of these cases deal with the same type of situation presented in *Boyle,* i.e., the taxpayer relied on an agent to actually perform the nondelegable duty of filing the return.[17] As in *Boyle,* these cases held that reliance on an agent was not reasonable cause for failing to perform a nondelegable duty. Other cases involved situations where the taxpayer claimed to have relied on an expert's advice concerning whether or when a return had to be filed as opposed to relying on the expert to file the return. Our review of such cases indicates that the holdings fall into three categories.

The first category of cases holds that, although a taxpayer claimed to have relied on an expert's advice concerning filing requirements, the section 6651(a)(1) addition nonetheless applied. In some of these cases, the courts found that the taxpayers did not prove that the expert actually gave the

---

[15]The Supreme Court also noted that *Boyle* did not involve a situation where the taxpayer was, for some reason, incapable by objective standards of exercising ordinary business care and prudence. *United States v. Boyle, supra* at 248 n.6.

[16]The Supreme Court noted that there was a difference of opinion among the courts over whether a taxpayer demonstrates reasonable cause when a taxpayer, relying on the advice of his attorney, files a return after the actual due date but within the time the attorney erroneously told him was available, but found it unnecessary to decide that issue. *United States v. Boyle, supra* at 251 n.9.

[17]See, e.g., *Crouse v. United States,* 711 F.2d 102, 104 (8th Cir. 1983); *Laney v. Commissioner,* 674 F.2d 342, 350 (5th Cir. 1982); *Fleming v. United States,* 648 F.2d 1122, 1125 (7th Cir. 1981); *Estate of Lillehei v. Commissioner,* 638 F.2d 65 (8th Cir. 1981); *Millette & Associates, Inc. v. Commissioner,* 594 F.2d 121, 124-125 (5th Cir. 1979); *United States v. Kroll,* 547 F.2d 393, 396 (7th Cir. 1977); *Logan Lumber Co. v. Commissioner,* 365 F.2d 846 (5th Cir. 1966); *Ferrando v. United States,* 245 F.2d 582 (9th Cir. 1957); *Estate of Rapelje v. Commissioner,* 73 T.C. 82 (1979); *Estate of Duttenhofer v. Commissioner,* 49 T.C. 200 (1967), affd. 410 F.2d 302 (6th Cir. 1969); *Baclit v. Commissioner,* T.C. Memo. 1989-576; *Sarto v. United States,* 563 F. Supp. 476 (N.D. Cal. 1983); *Daley v. United States,* 480 F. Supp. 808 (D.C.N.D. 1979); *Pfeiffer v. United States,* 315 F. Supp. 392 (E.D. Cal. 1970).

advice upon which the taxpayer claims to have relied.[18]   In other cases, the courts found that the taxpayers did not fully disclose all relevant information to the expert, apparently concluding that reliance on an uninformed expert is not reasonable.[19]   In still other cases, the courts found that the taxpayers did not demonstrate that the individual upon whose advice the taxpayer relied was an expert, apparently reasoning that reliance on someone who is not shown to be an expert for expert advice is not reasonable.[20]   In all these cases, the courts found either that no advice was given upon which the taxpayer could rely, or that the taxpayer was not reasonable in relying on the advice given.

In the second category of cases, the taxpayers claimed that they did not timely file returns because they relied on an expert's advice that no additions to tax would be due because no tax liability existed upon which the addition to tax is computed.[21]   In these cases, the expert did not tell the taxpayers that they were not required to file a return or give erroneous advice concerning the proper filing date.   Instead, the expert told the taxpayers that no addition to tax would be owing even if a required return was not timely filed.   In this situation, the taxpayers were not reasonable in failing to file because the expert upon whose advice they claimed to rely did not tell them that they did not have to file a return.   These cases are similar to many of the cases in the first category in that there really was no erroneous advice concerning return-filing requirements upon which to rely.   As in the first category, the courts held that the failure to file was not due to reasonable cause.

In the third category of cases, the courts found that reliance on an expert was reasonable cause for failing to file timely the return.[22]   In these cases, the courts found that the taxpayer

---

[18]See, e.g., *Denenburg v. United States,* 920 F.2d 301 (5th Cir. 1991); *Estate of Newton v. Commissioner,* T.C. Memo. 1990-208.

[19]See, e.g., *Yale Ave. Corp. v. Commissioner,* 58 T.C. 1062, 1077 (1972); *Fourth & Railroad Realty Co. v. Commissioner,* 25 T.C. 458, 461 (1955); *Stovall v. Commissioner,* T.C. Memo. 1983-450, affd. 762 F.2d 891 (11th Cir. 1985); *Estate of Meredith v. Commissioner,* T.C. Memo. 1981-72.

[20]See, e.g., *Sanders v. Commissioner,* 21 T.C. 1012, 1019 (1954), affd. 225 F.2d 629 (10th Cir. 1955); *Baclit v. Commissioner, supra; Estate of Meredith v. Commissioner, supra.*

[21]See, e.g., *Jackson v. Commissioner,* 864 F.2d 1521, 1527 (10th Cir. 1989); *Ballard v. Commissioner,* 854 F.2d 185, 189 (7th Cir. 1988); *Estate of Hollo v. Commissioner,* T.C. Memo. 1990-449; *Gore v. Commissioner,* T.C. Memo. 1987-425; *Fox v. Commissioner,* T.C. Memo. 1975-64.

[22]See, e.g., *Sanderling, Inc. v. Commissioner,* 571 F.2d 174 (3d Cir 1978); *Commissioner v.*

made full disclosure to the expert, that the taxpayer relied in good faith on the expert's advice, and that the taxpayer did not otherwise know that the return was due. In these cases, the courts found that the addition to tax did not apply.

The distinction between the first two categories and the third is clear: in the former, the evidence indicated that the taxpayer's claimed reliance was not proven or was not reasonable. By contrast, cases in the third category involved taxpayers who reasonably and in good faith relied on the erroneous advice of their experts.

Our analysis would not be complete if we failed to acknowledge that this third category of cases has two subcategories. The first subcategory involves expert advice that the taxpayer's situation was such that no return at all was required. Examples of these situations include advice that no gift tax return was required because no taxable gift was made, *Georgia Ketteman Trust v. Commissioner,* 86 T.C. 91, 108-109 (1986); advice that the value of an estate was less than the amount necessary to give rise to a legal requirement to file an estate tax return, *Estate of Paxton v. Commissioner,* 86 T.C. 785, 819-820 (1986); and advice that a taxpayer did not fall within the legal definition of a personal holding company and, therefore, need not file a personal holding company return, *Haywood Lumber & Mining Co. v. Commissioner,* 178 F.2d 769 (2d Cir. 1950). As to this subcategory, reliance on legal advice that the taxpayer had no obligation at all to file a return constitutes reasonable cause for purposes of section 6651(a)(1). *Ballard v. Commissioner,* 854 F.2d 185, 189 (7th Cir. 1988); *Estate of Paxton v. Commissioner, supra* at 819-820. With respect to these situations the Supreme Court said:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose

*American Association of Eng. Emp.,* 204 F.2d 19, 21 (7th Cir. 1953); *Haywood Lumber & Mining Co. v. Commissioner,* 178 F.2d 769 (2d Cir. 1950); *Hatfried, Inc. v. Commissioner,* 162 F.2d 628 (3d Cir. 1947); *Zabolotny v. Commissioner,* 97 T.C. 385 (1991); *Estate of DiPalma v. Commissioner,* 71 T.C. 324 (1978); *Coldwater Seafood Corp. v. Commissioner,* 69 T.C. 966, 974 (1978); *West Coast Ice Co. v. Commissioner,* 49 T.C. 345, 351 (1968); *Amo Realty Co. v. Commissioner,* 24 T.C. 812, 817 (1955).

of seeking the advice of a presumed expert in the first place. [*United States v. Boyle,* 469 U.S. at 251.]

Thus, a taxpayer who retains a qualified attorney and relies in good faith on the attorney's advice with respect to a legal question has exercised ordinary business care and prudence within the meaning of section 301.6651-1(c)(1), Proced. & Admin. Regs. If, as a direct result of reliance on such advice, the taxpayer fails to meet its filing obligation, the taxpayer should not be held liable for the addition to tax under section 6651(a)(1) because the failure to file timely was due to reasonable cause.

The second subcategory of cases involves taxpayers whose late filing was caused by erroneous expert advice as to the date that the law required the taxpayer to file its return. The Supreme Court acknowledged that courts are split on whether reliance on this type of advice can constitute reasonable cause for purposes of section 6651(a)(1).

Courts have differed over whether a taxpayer demonstrates "reasonable cause" when, in reliance on the advice of his accountant or attorney, the taxpayer files a return after the actual due date but within the time the adviser erroneously told him was available. Compare *Sanderling, Inc. v. Commissioner,* 571 F.2d 174, 178-179 (CA 3 1978) (finding "reasonable cause" in such a situation); *Estate of Rapelje v. Commissioner,* 73 T.C. 82, 90, n. 9 (1979) (same); *Estate of DiPalma v. Commissioner,* 71 T.C. 324, 327 (1978) (same), acq., 1979-1 Cum. Bull. 1; *Estate of Bradley v. Commissioner,* 33 TCM 70, 72-73 (1974) (same), aff'd. 511 F.2d 527 (CA 6 1975), with *Estate of Kerber v. United States,* 717 F.2d 454, 454-455, and n.1 (CA 8 1983) (*per curiam*) (no "reasonable cause"), cert. pending, No. 83-1038; *Smith v. United States,* 702 F.2d 741, 742 (CA 8 1983) (same); *Sarto v. United States,* 563 F. Supp. 476, 478 (ND Cal. 1983) (same). We need not and do not address ourselves to this issue. [*United States v. Boyle,* 469 U.S. at 251 n.9.]

As indicated by the above quote, the Tax Court has consistently held that erroneous legal advice with respect to the date on which a return must be filed can constitute reasonable cause for failure to file timely a return if such reliance was reasonable under the circumstances.

In *Estate of DiPalma v. Commissioner,* 71 T.C. 324, 327 (1978), the attorney for the estate led the executrix to believe that pending litigation justified delaying the filing of the estate tax return. As a result, the estate tax return was filed late. Respondent argued that the executrix had a nondelegable duty to file timely and that she could not discharge this duty by

relying on an attorney. We rejected this argument, pointing out that the cases on which respondent relied generally involved taxpayers who had relied upon their lawyers or accountants to actually perform the nondelegable duty of filing. We held that the taxpayer's good faith reliance on its attorney's erroneous advice regarding the due date of the return constituted "reasonable cause". Accord *Sanderling, Inc. v. Commissioner,* 571 F.2d 174, 178-179 (3d Cir. 1978); *Estate of Rapelje v. Commissioner,* 73 T.C. 82, 90, n.9 (1979); *Estate of Bradley v. Commissioner,* T.C. Memo. 1974-127. In *Estate of Rapelje v. Commissioner, supra* at 90 n.9, we commented on our opinion in *Estate of DiPalma* and noted that reasonable reliance on an attorney's advice as to when a return is due falls into the same category of cases as those in which taxpayers relied on an attorney's advice that no return at all need be filed. Both situations require someone to ascertain the duties imposed by law, and in both situations, lay persons typically rely on the advice of experts. These cases are distinguishable from those in which the taxpayer simply delegates all responsibility for filing to an agent.

The Supreme Court contrasted the rule applied by this Court and the Third Circuit with *Estate of Kerber v. United States,* 717 F.2d 454, 454 n.1, 455 (8th Cir. 1983) (per curiam), and *Smith v. United States,* 702 F.2d 741, 742 (8th Cir. 1983). *United States v. Boyle, supra* at 251 n.9. We have examined these two Eighth Circuit decisions and the cases upon which they rely. *Kerber* and *Smith* rely on *Boeving v. United States,* 650 F.2d 493 (8th Cir. 1981), and *Boeving* relies on *Estate of Lillehei v. Commissioner,* 638 F.2d 65 (8th Cir. 1981). However, *Estate of Lillehei* did not involve a taxpayer who relied on the erroneous advice of an expert. Instead, *Estate of Lillehei* involved a taxpayer who relied on an expert to perform the nondelegable duty of filing its return. The executor in *Estate of Lillehei* "never inquired as to when the return was due, nor did he follow up with his lawyer to make sure the return was not filed late." *Estate of Lillehei v. Commissioner, supra* at 66. Neither *Kerber, Smith,* nor *Boeving* addresses this factual distinction. Instead, they cite *Estate of Lillehei,* or its progeny, *Boeving,* and hold that reasonable cause did not exist. From this we can only conclude that the Eighth Circuit did not believe that the facts in *Kerber, Smith,* and *Boeving* were

distinguishable from *Estate of Lillehei.* All these opinions preceded *United States v. Boyle, supra.* In *Boyle,* the Supreme Court made clear that a taxpayer's reliance on an agent to perform a nondelegable duty is different from a taxpayer's reliance on an expert's advice. We hold that reasonable reliance on the erroneous advice of an attorney with respect to the due date of a return can constitute "reasonable cause" within the meaning of section 6651(a)(1).

Our next inquiry is whether petitioner in this case relied in good faith on an attorney's advice with respect to the due date of the return. Petitioner's representative, Ms. Koithan, did not delegate her duty to file the estate tax return to the estate's attorney, Mr. Tipton. Indeed, she was aware that the estate tax return had to be filed within 9 months of the date of decedent's death and that it was her responsibility to file the return. However, when the filing due date of the estate tax return approached, Ms. Koithan was concerned that she would not be able to file an accurate estate tax return because of a lack of adequate appraisals. She consulted with Mr. Tipton who advised her to request an extension. She followed Mr. Tipton's advice and filed a request for a 6-month extension to file the estate tax return, which was approved by respondent.

Six months later when the extended due date approached, Ms. Koithan was again concerned that she would not be able to file an accurate return. She consulted with Mr. Tipton. Mr. Tipton advised her that petitioner could obtain a second extension of time in which to file its estate tax return. She relied on his advice and filed a second request for a 6-month extension. Mr. Tipton's advice that petitioner could obtain a second extension beyond the original 6 months was erroneous. However, Ms. Koithan did not know that this advice was not correct.

Section 6075(a) provides that an estate tax return shall be filed within 9 months after the date of decedent's death. Section 6081(a) provides, however, that "The Secretary may grant *a reasonable extension* of time for filing any return * * *. Except in the case of taxpayers who are abroad, *no such extension* shall be for more than 6 months." (Emphasis added.) Although an extension referred to in section 6081 is limited to 6 months, the statute does not explicitly state that the

Secretary may only grant one extension,[23] or that the taxpayer may not receive multiple extensions, or that the aggregate of all extensions may not exceed 6 months. The instructions which accompany the Application for Extension of Time to File U.S. Estate Tax Return and/or Pay Estate Tax (Form 4768) state that *"The time to file extension* may not exceed 6 months unless the personal representative is out of the country." (Emphasis added.) Again, there is no explicit statement that a second extension may not be granted or that the aggregate of extensions may not exceed 6 months. It is only after reading the penultimate sentence of the pertinent estate tax regulation that one finds a statement that literally restricts the total allowable extended time period to 6 months. Section 20.6081-1(a), Estate Tax Regs., provides:

Extension of time for filing the return.—(a) In case it is impossible or impracticable for the executor to file a reasonably complete return within 9 months * * * from the date of death, the district director or the director of a service center may, upon a showing of good and sufficient cause, grant a reasonable extension of time for filing the return required by section 6018. Unless the executor is abroad, the extension may not be for more than 6 months from the date for filing provided by section 6075(a). *Therefore, unless the executor is abroad, the due date for filing the return under any extension granted by a district director or a director of a service center may not be later than 15 months * * * from the date of the decedent's death. The extension may, of course, be for a lesser period of time.* [Emphasis added.]

In light of the foregoing analysis, we believe it would be unreasonable to hold that a taxpayer could not rely on the advice of an attorney with respect to the availability of multiple filing extensions.[24] Indeed, we think a prudent taxpayer would seek and rely on the advice of a tax expert with respect to such matters.

Respondent did not notify petitioner that she had not approved petitioner's second request for an extension until the audit of petitioner's estate tax return in 1986. Respondent did, however, negotiate the check which accompanied petitioner's

---

[23]It appears that respondent will grant more than one extension with respect to a particular return. See, e.g., *Estate of Archer v. Commissioner,* T.C. Memo. 1984-57.

[24]In a prior case dealing with these same provisions, we found it unnecessary to "definitively construe section 6081(a)". Instead, we upheld respondent's position that sec. 6081(a) generally limits the aggregate of extensions to 6 months, finding that respondent's interpretation was neither unreasonable, arbitrary, or capricious; noting, however, that we did not necessarily agree with respondent's interpretation. *Estate of Young v. Commissioner,* T.C. Memo. 1983-686.

second request for extension of time. From petitioner's perspective, this sequence of events was exactly the same as what had taken place with respect to its first request for an extension: petitioner submitted a request for an extension along with a check; respondent negotiated the check which accompanied the request; and respondent, contrary to the instructions in her own form, failed to notify petitioner that she had approved or denied the request.[25] Respondent's failure to notify petitioner that its second request for extension was denied, coupled with the fact that respondent negotiated the check which accompanied this request, left petitioner with the impression that respondent had approved the request.

When petitioner finally filed the estate tax return, it made an election on the return to pay the tax in installments pursuant to section 6166. This election, to be valid, must be made on a timely filed return. After petitioner made this election, respondent billed petitioner for the annual installments due under petitioner's section 6166 election. While this alone would not constitute reasonable cause, it indicates petitioner's reasonableness in continuing to believe that it had obtained a second extension for filing.

Respondent's failure to notify petitioner of a denial, the negotiation of the accompanying check, and respondent's initial recognition of the section 6166 election suggest that respondent probably did not deny petitioner's second extension until the audit of petitioner's return. Since the second request for extension clearly indicated on its face that the requested extension date was beyond 6 months from the original due date, the most plausible explanation for respondent's actions (or lack thereof) is that her own agents did not recognize that a second extension was not available. The evidence suggesting that respondent's own agents may not have been aware of the impropriety of petitioner's second extension request cuts against respondent's position that Ms. Koithan should have known that the second request for extension was improper despite the contrary advice of her attorney. See *Sanderling, Inc. v. Commissioner*, 571 F.2d at 178.

---

[25]The Application for Extension of Time to File U.S. Estate Tax Return and/or Pay Estate Tax (Form 4768) states: "The Internal Revenue Service will complete Part IV [of the form which indicates whether the extension was approved] and return a copy to the applicant."

Respondent cites *Fleming v. United States,* 648 F.2d 1122, 1125 (7th Cir. 1981), and *Estate of Smith v. United States,* 589 F. Supp. 836 (E.D. La. 1984), in support of her position that petitioner's failure to file was not due to reasonable cause. Respondent's reliance on these cases is misplaced.

In *Fleming,* the taxpayer argued that his failure to file was due to reasonable cause because he relied on his attorney's statement that an application for an automatic extension had been filed. The Court held that the failure to file was not due to reasonable cause, because the taxpayer had a personal nondelegable duty to file the return on time, and this nondelegable duty included the proper and timely filing of an application for an extension. The holding in *Fleming* is consistent with *United States v. Boyle, supra,* and does not turn on the specific issue raised in the instant case.

In *Estate of Smith v. United States, supra* at 839, the District Court for the Eastern District of Louisiana found as a fact that the estate's representative, relying on his own knowledge and that of his accountant, erroneously believed that the only detriment that the estate would suffer for failing to file timely its estate tax return was that interest would begin to accrue. The court found that the evidence did not demonstrate that the taxpayer relied exclusively on the advice of his accountant and held for the Government. We distinguish *Estate of Smith* on the basis that the court did not find, as we have in this case, that the expert erroneously advised the taxpayer that it did not have to file a return within the proper time.

Respondent also relies on *Sarto v. United States,* 563 F. Supp. 476 (N.D. Cal. 1983). In *Sarto,* the taxpayer argued that he relied on his attorney to obtain an extension for filing an estate tax return. *Sarto v. Commissioner, supra* at 477. The District Court held that timely filing a tax return is a nondelegable duty and that the failure of an agent to perform this duty does not constitute reasonable cause. *Sarto v. Commissioner, supra* at 478. The facts in *Sarto* are thus distinguishable from the instant case.

Finally, respondent argues that our opinion in *Estate of Di Fiore v. Commissioner,* T.C. Memo. 1987-588, precludes a finding that petitioner's delinquency was due to reasonable cause. In *Estate of Di Fiore,* we found as a fact that the estate, acting through its expert, improperly filed a request for

a second extension. Based on this finding, we held that the taxpayer delegated its responsibility for timely filing the return to its expert, and that this delegation did not constitute reasonable cause for failing to file a return. Respondent relies on language in the *Estate of Di Fiore* opinion which suggests that advice on whether a second extension could be obtained was not a question of law and, as such, a taxpayer could not reasonably rely on it. We have reviewed our opinion in *Estate of Di Fiore* and find that, in the context of that case, the language to which respondent refers is dicta and we decline to follow respondent's interpretation of that language.

After reviewing the entire record and examining the relevant case law, we find that petitioner reasonably and in good faith relied on erroneous advice from its attorney. Such reliance caused petitioner's estate tax return to be untimely. We hold that such reliance constitutes "reasonable cause" within the meaning of section 6651(a). Accordingly, petitioner is not liable for the addition to tax under section 6651(a)(1).

The final issue for decision is whether petitioner is liable for the addition to tax under section 6651(a)(2) for failure to pay timely its estate tax. Section 6651(a)(2) provides for an addition to tax for failure to pay taxes shown on a return on or before the date prescribed for payment. The addition to tax is 0.5 percent of the amount of such tax for each month or fraction thereof during which the failure continues. However, like section 6651(a)(1), the addition to tax does not apply if the taxpayer can demonstrate that the failure is due to "reasonable cause" and not willful neglect. As with the addition to tax for failure to file timely, petitioner concedes that it did not timely pay its estate tax but argues that its failure was due to reasonable cause. Also, as with the addition to tax for failure to file timely, respondent makes no argument that petitioner's failure was due to willful neglect but, instead, argues that reasonable cause is not present in this case.

Petitioner did not timely pay the estate tax shown on the return because it elected to defer payment under section 6166. The section 6166 election was invalid because it was made in a return which was not timely filed. The failure to file timely was the direct result of petitioner's reasonable reliance on its attorney's erroneous advice. It appears that respondent initially accepted the section 6166 election and only disallowed

it after she determined that the estate had improperly requested a second extension of time in which to file its estate tax return. At the time payment of the estate tax was due, petitioner reasonably believed that the section 6166 election was proper. Under these circumstances, we find that petitioner exercised ordinary business care and prudence in providing for the payment of its tax liability.[26]

In section 301.6651-1(c), Proced. & Admin. Regs., a taxpayer may also demonstrate reasonable cause for failure to pay taxes by showing—

that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161-1(b) of this chapter) if he paid on the due date.

Section 1.6161-1(b), Income Tax Regs., defines "undue hardship" as—

more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer from making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship.

We find that petitioner demonstrated that it "would suffer an undue hardship (as described in sec. 1.6161-1(b) of this chapter) if * * * [it] paid on the due date." Although section 1.6161-1(b), Income Tax Regs., contains a general description of situations within the meaning of the term "undue hardship", it contains no working examples to shed light on the meaning of terms such as "more than an inconvenience", "substantial financial loss", and "sacrifice price". However, section 20.6161-1(a)(2)(ii), Estate Tax Regs., contains examples under its definition of "undue hardship". Because these two regulations use the same language to describe the same term for purposes of the same section of the Internal Revenue Code, we find that the examples in section 20.6161-1(a)(2)(ii), Estate Tax Regs., illustrate the application of the term "undue hardship" as

---

[26]The same "reasonable cause" exception contained in the last sentence of sec. 6651(a) applies to both paragraphs (1) and (2) of sec. 6651(a).

defined in section 1.6161-1(b), Income Tax Regs., and used in section 301.6651-1(c), Proced. & Admin. Regs.

Section 20.6161-1(a)(2)(ii), *Example (1)*, Estate Tax Regs., describes the following fact pattern as an example of undue hardship:

A farm (or other closely held business) comprises a significant portion of an estate, but the percentage requirements of section 6166(a) (relating to an extension where the estate includes a closely held business) are not satisfied and, therefore, that section does not apply. Sufficient funds for the payment of the estate tax when otherwise due are not readily available. The farm (or closely held business) could be sold to unrelated persons at a price equal to its fair market value, but the executor seeks an extension of time to facilitate the raising of funds from other sources for the payment of the estate tax.

In the instant case, petitioner's closely held businesses constituted in excess of 95 percent of the adjusted gross estate. Thus, the percentage of petitioner's assets which were closely held businesses exceeded that of the taxpayer in the example,[27] and presumably petitioner had less liquidity because more of its assets were tied up in the closely held business. Similarly, the fact that the assets in the closely held businesses constituted over 95 percent of the adjusted gross estate indicates that sufficient funds with which to pay the estate tax when otherwise due were not readily available. Although not as clear, the record also indicates that the market for hotel properties, which comprised the bulk of the assets in petitioner's closely held businesses, was soft. Due principally to the economic decline with respect to the hotel properties, the net assets of the revocable trust and Beta trust declined in value from $25 to $6 million between the date of death and May 1989. Petitioner has tried to sell a number of its properties for some time but, as a result of the depressed economy, it has not been successful. The facts presented by petitioner in this case provide a basis for finding "undue hardship".

*Decision will be entered under Rule 155.*

---

[27]The percentage requirement of sec. 6166(a) referred to in the example is 35 percent.