ESTATE OF KATE CLARK MELVILLE, DECEASED, BANK OF NEW YORK, EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Melville v. Commissioner
Docket No. 22027-90
United States Tax Court
T.C. Memo 1993-484; 1993 Tax Ct. Memo LEXIS 496; 66 T.C.M. (CCH) 1076; October 20, 1993, Filed *496 Decision will be entered under Rule 155. For petitioner: Jon Holden Adams. For respondent: Pientra Pastore. PARKER
PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency in petitioner's Federal estate tax of $ 53,744 and an addition to tax under section 6651(a)(1) of $ 13,436. [1] The deficiency was due to the disallowance of certain administration expense deductions. After concessions, [2] the issues for decision are: (1) Whether petitioner, the estate of Kate Clark Melville, is entitled to deduct the full amount of executor's "receiving and paying" commissions allowed by the Surrogate's Court; specifically, the issue is whether the value of real property, which was specifically devised by the decedent's will to the decedent's grandchildren but which was *497 later deeded to two of her children (the parents of those grandchildren) pursuant to a settlement of a will contest, should be included for purposes of computing executor's "receiving and paying" commissions under New York State law; and (2) Whether petitioner is liable for an addition to tax under section 6651(a)(1) for failure to timely file an estate tax return. *498 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the date of the decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and accompanying exhibits are incorporated herein by this reference. Kate Clark Melville (the decedent) died testate on July 24, 1985, a resident of the Town of Pleasant Valley, County of Dutchess, State of New York. In 1961 the decedent had executed a will, the dispositive provisions of which left the bulk of her estate to her three children, David Melville, Sheila Traver, and John Melville (hereinafter referred to as David, Sheila, and John, respectively). However, all real estate was devised to David and Sheila. The 1961 will appointed the decedent's brother, Benjamin S. Clark, and the Bank of New York as executors of and trustees under that will. In 1968 the decedent executed an inter vivos trust, naming her brother, Benjamin S. Clark, and the Bank of New York as cotrustees. The Bank of New York was also the trustee of two other trusts for the decedent's benefit. *499 The inter vivos trust gave the decedent an income interest for life, and directed that, upon her death, the principal, primarily stocks and bonds, go to beneficiaries as designated in her will. The trust agreement was amended in 1973. [3]
On or about February 10, 1978, the decedent's children, David and Sheila, commenced a proceeding to appoint a conservator for her, alleging that she was no longer able to manage her own affairs. The decedent's physician had diagnosed her as suffering from an organic brain syndrome and manic depressive illness. Soon after commencement of the conservatorship proceeding, the decedent consulted attorney John J. Gartland, Jr. (Gartland) for advice. [4]Gartland *500 arranged to have the decedent discuss the conservatorship proceeding with a litigator in Gartland's firm who undertook her defense. Soon thereafter, the decedent again consulted Gartland. She was quite upset that her children, David and Sheila, were pursuing the conservatorship proceeding. She stated that she wanted to change her will so that David and Sheila would not receive any of her assets upon her death. Gartland prepared a new will, following the decedent's instructions that her grandchildren (the children of David and Sheila) be substituted for David and Sheila. On April 14, 1978, while the conservatorship proceeding was pending, the decedent revoked her 1961 will and executed this new will in which she left her testamentary *501 estate to her grandchildren, with a life estate for her son, John (the 1978 will). The 1978 will made substantial changes. All real property was devised to the decedent's grandchildren surviving the decedent, as tenants in common in equal shares, with a life estate to John Melville as to that parcel of real property owned and occupied by the decedent as her and John's residence. All personal property was to be divided among the grandchildren, with the reservation of a life estate to John Melville of any personal property in her residence. The residuary estate, including property over which the decedent had a power of appointment, was given in equal one-third shares to John Melville, to the then living children of Sheila Traver, and to the then living children of David Melville, subject to trusts. The trusts for the children of Sheila Traver and David Melville were to accumulate until each beneficiary attained 35 years of age, at which time the beneficiary would obtain the remaining principal. As to the trust created for John Melville, it would be held for his lifetime, and upon his death, would go to his then living descendants, if any, and if none, to the decedent's grandchildren *502 subject to the terms of their trusts. Gartland was unaware of the existence of the 1968 inter vivos trust and the other two trusts under which the Bank of New York was the trustee. Gartland and Marine Midland Bank were named coexecutors of the estate and cotrustees of the testamentary trusts in the decedent's 1978 will. The decedent named two executors and two trustees because she was concerned about her son, John, who was mentally incompetent: Gartland's duty was to make sure that the corporate fiduciary took care of John. [5]
*503 On August 15, 1978, the conservatorship proceeding was concluded, and conservators (State Senator Jay P. Rolison, Jr. and Marine Midland Bank, later changed to the Dutchess Bank and Trust Company) were appointed to manage the decedent's affairs. On September 28, 1978, in a codicil to her 1978 will, the decedent changed the designation of the institutional executor and trustee under her will to the Dutchess Bank and Trust Company. The conservators continued to manage the decedent's affairs until her death on July 24, 1985. [6]
On or about September 5, 1985, after the decedent's death, Gartland and Owen T. Clarke (Clarke), vice president and trust officer of the Dutchess Bank and Trust Company, as the executors designated by the 1978 will, filed a petition for the probate of the 1978 will *504 and codicil with the New York State Surrogate's Court of Dutchess County (the Surrogate's Court). On October 16, 1985, the decedent's children, David and Sheila, demanded oral examination of the witnesses to the 1978 will and codicil. Under section 1404 of the New York Surrogate's Court Procedure Act, examination of the witnesses to a will is the first of several steps to be observed in the commencement of a will contest. It became clear to Gartland early on that the will contest could extend over a long period of time. He contacted Clarke to advise him that they should obtain preliminary letters testamentary from the Surrogate's Court in order to pay current obligations and maintain whatever assets of the estate that became available. Specifically, in the request for preliminary letters testamentary, Gartland stated: That in order to pay the aforesaid obligations your petitioner prays that Preliminary Letters Testamentary be issued to him jointly with the Dutchess Bank & Trust Company for the purposes of enabling them to pay the current obligations and to proceed to marshall and preserve the assets of the estate, including the care of the real property.
On October *505 24, 1985, Gartland and the Dutchess Bank and Trust Company were issued preliminary letters testamentary by the Surrogate's Court. Clarke assumed the function of attempting to collect and preserve the assets of the estate. In a letter dated October 16, 1985, Edward Dolan, senior trust administrator of the Bank of New York, the trustee of the decedent's 1968 inter vivos trust and the other two trusts for her benefit, provided Clarke with a list of the trust assets of the decedent. The Bank of New York as trustee would not relinquish control of any of those assets pending the outcome of the will contest. At the time of the decedent's death, the value of the assets of the inter vivos trust was $ 1,325,665. The values of the assets of the other two trusts over which the decedent had a power of appointment were $ 306,746 and $ 76,691. The balance of the decedent's gross estate was primarily attributable to the value of her residence and adjacent parcels of land that the decedent occupied with her son, John. [7] Under the decedent's testamentary disposition, the real estate was subject to a life estate for the benefit of John. An appraisal, dated February 6, 1986, determined that the *506 fair market value of the real property owned by the decedent as of the date of her death was $ 626,840. [8] The total tangible personal property, as of the date of death, was appraised at $ 24,768.50. Clarke also assumed some duties of managing the decedent's real estate holdings during the will contest. After receipt of the preliminary letters testamentary, Clarke undertook *507 to maintain the decedent's and John's residence by paying the insurance fees, real property taxes, and the other expenses of maintaining the property. He would visit periodically, and the resident caretaker would report to Clarke on a regular basis. Clarke had available to him the cash flow from the income of the inter vivos trust to pay the caretaker and maintain the property. [9]
On February 19, 1986, David and Sheila filed objections to probate of the decedent's 1978 will and codicil, claiming that the 1978 documents were not executed properly, that the decedent was not competent in that she was not of sound mind and memory at that time to execute the documents, that there was a mistake by the decedent *508 in the execution of the instruments, and that there was fraud, coercion, and undue influence exerted upon the decedent. They also argued that the person who prepared the will and codicil had misinterpreted the decedent's instructions. On July 9, 1986, they filed amended objections to probate, adding that the New York State probate statute was not followed insofar as the draftsmen of the 1978 will failed to inform or advise the decedent that two commissions would be due and owing for the trusts and for the executors of the will. David and Sheila were permitted to view a videotape of the execution of the 1978 will that had been made in anticipation of the possibility of a will contest, but apparently they remained unconvinced. [10]
*509 A United States Estate Tax Return (Form 706) was due to be filed 9 months after the date of the decedent's death, on or before April 24, 1986. During the period after the decedent's death and prior to April of 1986, Gartland and Clarke discussed whether they should file an estate return or request an extension of time within which to file. They discussed that there were no assets actually in the estate at that time because the conservators controlled whatever money the decedent may have had at her death and the rest of her assets were being managed by the Bank of New York, as the trustee of the 1968 inter vivos trust and of the other two trusts. Gartland had asked Clarke to attempt to obtain some of the decedent's assets so that a return could be filed and the estate taxes paid, but Clarke learned that the Bank of New York, acting under advice of counsel, would not consent to the release of any assets or funds of the three trusts until the Surrogate's Court had reached a decision as to whether the 1978 will would be admitted to probate. Gartland and Clarke were well aware that, regardless of the outcome of the will contest, an estate tax return was required to be filed for the *510 decedent's estate. However, they concluded that a return should not be filed during the pendency of the will contest since the identities of the ultimate beneficiaries and fiduciaries remained uncertain. They also noted that it was likely that the litigation would extend beyond any period for which an extension of time to file or pay could be obtained. Gartland told Clarke that, based on his experience, if good cause is shown, the Internal Revenue Service generally waives the additions to tax imposed, although, of course, the estate still must pay the tax due and the interest. [11] In any event, Gartland and Clarke mutually agreed that no estate tax return would be filed at that time. In the meantime, the Bank of New York, as inter vivos trustee, filed annual fiduciary income tax returns for those assets over which it retained control. *511 On February 5, 1987, David and Sheila entered into an agreement with Gartland and Clarke that, subject to the approval of the Surrogate's Court, settled their claims. The agreement proposed to deed certain real property, devised by the decedent to her grandchildren in her 1978 will, to David and to Sheila. The property would remain subject to a life estate for John Melville and subject to a right of first refusal by the grandchildren if David or Sheila were to decide to sell. Essentially Sheila received Parcel 1, including the residence, subject to John's life estate, and David received Parcels 2 and 3. See supra notes 7, 8. Also, as part of the proposed settlement, on June 26, 1987, Gartland renounced his appointment as coexecutor of the estate and all rights to the letters of administration in the estate of the decedent. A guardian ad litem had at some point been appointed by the Surrogate's Court to protect the interests of Mark Jonathan Melville (Mark), the then 16-year-old son of David Melville and grandson of the decedent. That guardian initially objected to the settlement as not being in the best interests of his ward because, if the 1978 will were found to have *512 been properly executed and were upheld, Mark would have eventually received, subject to the trust provisions, one-ninth of the residuary estate, including the assets of any trusts over which the decedent has a power of appointment; one-sixth of John's trust upon John's death; one-sixth of all real property, subject to the life estate of John; and one-sixth of all tangible personal property, subject to the life estate of John. The guardian proposed that one-third of the real property (approximately 16 acres), which was to have been transferred to David, be transferred instead to Mark. That apparently was never done, and, after Mark attained his majority, he apparently agreed to the original settlement agreement. Before the settlement offer was approved by the Surrogate's Court, the Dutchess Bank and Trust Company as executor (through Clarke) filed an estate tax return (Form 706) with the Internal Revenue Service in Andover, Massachusetts, on August 3, 1987. Gartland participated in the preparation of that Form 706. No extension of time to file the Form 706 had been sought from or granted by respondent. [12]
*513 On June 30, 1988, the Surrogate's Court accepted the settlement agreement. The 1978 will and codicil were admitted to probate on July 25, 1988. The real property was thereafter conveyed by the Dutchess Bank and Trust Company to David and Sheila through the execution of executor's deeds. On September 17, 1989, the Surrogate's Court abated any late filing additions as to the New York State estate tax return. The Bank of New York acquired the Dutchess Bank and Trust Company in 1989, and thereafter the Bank of New York (Dutchess Division) served as the inter vivos trustee, the testamentary trustee, and the executor of the estate. The Bank of New York, as executor, submitted to the Surrogate's Court an account of proceedings for the time period from July 24, 1985, the date of the decedent's death, through May 31, 1991, setting forth the estate's receipts and payments. Gartland advised Vincent Pangia, the accountant hired by the bank to prepare the accounting for the estate, that he (Pangia) should propose to the Surrogate's Court that the bank is entitled to full commissions on the real property transferred to the decedent's two children as part of the settlement as if it were a *514 sale. The record in this case does not indicate whether such proposal was submitted to the Surrogate's Court. If the proposal was made to the Surrogate's Court, the record does not disclose the ruling thereon or the basis for any such ruling. The record merely discloses that the statutory rates for executor's "receiving and paying" commissions were applied to the full date-of-death value of all real property. In Schedule A of the account of proceedings, which lists the total principal of assets received by the estate, the executor included real estate in the amount of $ 626,840. In Schedule E of the account of proceedings, the executor listed the legacies or distributive shares actually paid from principal, including (1) distribution of property to Sheila (24.87 acres) in the amount of $ 74,610; (2) distribution of property to David (58.38 acres) in the amount of $ 175,140; and (3) distribution to Sheila subject to life estate of John Melville in the amount of $ 377,090. [13] These distributions total $ 626,840. *515 The executor's "receiving and paying" commissions were computed in the account of proceedings as follows: For Receiving:
2 1/2% of first
$   100,000.00
$  2,500.00
2% of next
200,000.00
4,000.00
1 1/2% of next
700,000.00
10,500.00
1 1/4% of next
1,000,000.00
12,500.00
1% of
590,566.10
5,905.66
$ 2,590,566.10
$ 35,405.66
For Paying:
2 1/2% of first
$   100,000.00
$  2,500.00
2% of next
200,000.00
4,000.00
1 1/2% of next
700,000.00
10,500.00
1 1/4% of next
1,000,000.00
12,500.00
1% of
585,868.12
5,858.68
$ 2,585,868.12
$ 35,358.68
Total "Receiving and
Paying" Commissions
$ 70,764.34
None of the decedent's heirs filed any objections or exceptions to the executor's accounting. On May 1, 1992, the Surrogate's Court entered a Decree of Final Judicial Settlement, accepting the accounting as presented by the executor. The Surrogate's Court allowed $ 70,764.34 for executor's "receiving and paying" commissions. No appeal was taken from that determination, and the time for an appeal from the Surrogate's Court has now elapsed. On July 2, 1990, respondent assessed the tax and a late filing addition in the amount of $ 126,615, *516 based on the estate tax return as filed. On July 5, 1990, respondent issued the statutory notice of deficiency determining a deficiency in the estate tax and a further addition to tax under section 6651(a)(1). See supra note 1. OPINION Deductibility of Executor's Commissions
Petitioner claimed on the estate tax return (Form 706) a deduction for executor's commissions in the amount of $ 60,050. Respondent disallowed all but $ 5,000 of the executor's commissions claimed. Subsequent to the issuance of the notice of deficiency, the Surrogate's Court allowed executor's commissions in the amount of $ 70,764.34. Respondent contends that the value of real property, which was specifically devised by the decedent's will to her grandchildren but later deeded to two of her children (the parents of those grandchildren) pursuant to a settlement of the will contest, should not be included for purposes of computing executor's "receiving and paying" commissions under New York State law. Respondent argues that the Surrogate's Court did not consider or did not properly apply New York State law in awarding executor's commissions and that neither respondent nor this Court is bound by *517 the determination of the Surrogate's Court. Section 2053(a) provides for the deduction of administration expenses, including executor's commissions: (a) General Rule. -- For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts -- * * * (2) for administration expenses, * * * as are allowable by the laws of the jurisdiction * * * under which the estate is being administered.
The requirements of section 2053 are twofold: first, the administration expense must be allowable under State law; and second, it must be allowable under the Federal regulations. Estate of Reilly v. Commissioner, 76 T.C. 369, 372 (1981); Estate of DeWitt v. Commissioner, T.C. Memo. 1987-502. Petitioner argues that the Surrogate's Court reasonably awarded executor's commissions after considering all relevant factors and that this Court should not "second guess" the findings of the local probate court as to its application of New York State law and its awarding of the commissions. Section 20.2053-1(b)(2), Estate Tax Regs., addresses *518 the effect of a local court decree: The decision of a local court as to the amount and allowability under local law of a claim or administration expense will ordinarily be accepted if the court passes upon the facts upon which deductibility depends. * * * It must appear that the court actually passed upon the merits of the claim. This will be presumed in all cases of an active and genuine contest. * * *
It is the burden of petitioner to prove that all of the facts necessary for deductibility under Federal estate tax law were considered and found during the State court's inquiry. Estate of DeWitt v. Commissioner, T.C. Memo. 1987-502. In this case, the Bank of New York, as executor, submitted an account of proceedings for the period from July 24, 1985, the date of the decedent's death, through May 31, 1991, setting forth the estate's receipts and payments. On May 1, 1992, the Surrogate's Court issued a decree of final judicial settlement. However, while the Surrogate's Court decree refers in passing to the settlement agreement and the conveyance of real property to David and Sheila in accordance therewith, there is no mention of the application *519 of section 2307 of the Surrogate Court's Procedure Act to such conveyance. The decree merely states that the court examined the executor's account of proceedings and "* * * finds the state and condition of the said account to be as stated * * *". With adjustments for earnings since the account of proceedings initially was filed, the Surrogate's Court awarded $ 70,764.34 in executor's commissions based on the New York State statutory rates applied without any explanation or elaboration. If a showing is made that a surrogate's court has considered the relevant facts in making its determination, the decree issued by that court awarding executor's commissions would carry great weight in our determination of deductibility for purposes of the Federal estate tax. Estate of Audenried v. Commissioner, 26 T.C. 120, 123 (1956); Estate of DeWitt v. Commissioner, T.C. Memo. 1987-502. However, such a showing has not been made in this case. While there was a will contest before the 1978 will was admitted to probate, there was no contest, "active and genuine" or otherwise, as to the award of executor's commissions. Sec. 20.2053-1(b)(2), *520 Estate Tax Regs. Thus, we cannot say that the Surrogate's Court ever considered the issue raised by respondent in this case. Even if such a showing had been made by petitioner, we give "proper regard", not "finality", to interpretations of State law by State trial courts. Commissioner v. Estate of Bosch, 387 U.S. 456, 464 (1967). We follow State law as announced by the highest court of the State. Id. at 465. If there is no decision by the highest court of the State, we consider the State's intermediate appellate court decisions unless we are convinced that the highest court of the State would rule otherwise. "If there be no decision by that [highest State] court then Federal authorities must apply what they find to be the State law after giving 'proper regard' to relevant rulings of other courts of the State. In this respect, it may be said to be, in effect, sitting as a State court." Id. This is especially necessary when the application of a Federal statute is involved: "the decision of a state trial court as to an underlying issue of state law should * * * not be controlling". Id.
Thus, this Court must *521 undertake, as instructed by the regulations and the Supreme Court in Estate of Bosch, an appellate review if it is alleged that State law was improperly applied: "The decree will not be accepted if it is at variance with the law of the State". Sec. 20.2053-1(b)(2), Estate Tax Regs.; see also Estate of Smith v. Commissioner, 510 F.2d 479, 482-483 (2d Cir. 1975), affg. 57 T.C. 650 (1972) (Federal courts cannot be precluded from reexamining a lower State court's allowance of administration expenses); United States v. White, 853 F.2d 107, 113-115 (2d Cir. 1988). Respondent argues that the Surrogate's Court did not properly apply New York State law in awarding executor's commissions, and, thus, neither respondent nor this Court is bound by the determination of the Surrogate's Court. Section 2307 of the Surrogate's Court Procedure Act (and its predecessor, section 285 of the Surrogate's Court Act) provides for commissions to fiduciaries, other than trustees, in fixed percentages for receiving and paying out all sums of money from the estate. Section 2307 of the Surrogate's Court Procedure Act *522 states that: 1. On the settlement of the account of any fiduciary other than a trustee the court must allow to him the reasonable and necessary expenses actually paid by him * * * * * * 2. The value of any property * * * received, distributed or delivered, shall be considered as money in computing commissions. But this shall not apply in case of a specific legacy or devise.
There is a well established rule under New York State law that commissions are not payable on unsold real property, regardless of the duties undertaken by the executor with respect to that property. In re Estate of Salomon, 252 N.Y. 381, 169 N.E. 616 (1930), revg. 226 A.D. 751, 233 N.Y.S. 881 (1929); In re Estate of Schaich, 55 A.D.2d 914, 391 N.Y.S.2d 135 (1977); In re Estate of Saphir, 73 Misc.2d 907, 343 N.Y.S.2d 20 (Surr. Ct. Kings Co. 1973). When an executor effects a transfer by executor's deed, the deed is a mere incident of conveyance, and the transaction should be treated as if the real property passed by operation *523 of law and the executor never received the asset. In re Estate of Moody, 125 A.D.2d 673, 510 N.Y.S.2d 18 (1986). Unless permitted or required to sell the real property, thus converting it into "money", an executor is not entitled to receiving and paying commissions on property transferred in kind. In re Estate of Wanninger, 120 A.D. 273, 105 N.Y.S. 4 (1907), affd. per curiam 190 N.Y. 527, 83 N.E. 1134 (1907); In re Estate of Saphir, 343 N.Y.S.2d at 24. The New York State Court of Appeals, the highest court of the State, has held that fiduciaries do not "receive" real property in settling an estate and therefore are not entitled to commissions on unsold real property. In re Estate of Salomon, supra. In that case, the testator provided in his will that, "For the purpose of the payment of legacies, and for the distribution and settlement of my estate, my real estate shall be deemed to be personal property." In re Estate of Salomon, 252 N.Y. at 382. *524 The trial court held that the direction in the will that real property be deemed to be personal property for the distribution and settlement of the estate constituted an equitable conversion of real property into personal property. Since the real estate thus was "money" and no longer constituted "unsold real property", the trial court allowed the executor's commissions claimed. The Appellate Division affirmed. The Court of Appeals, however, reversed. The Court of Appeals stated that: The question here is whether the executors are entitled to commissions upon the value of the real property left by the testator. The will did not convey to the executors title to the real property or grant to them power to sell it. The testator left sufficient personal property to pay all of his debts and legacies, so that the necessity of selling the real property never arose and the executors never exercised the power conferred upon them to convert the real property into personalty.
In re Estate of Salomon, 252 N.Y. at 383. The Court of Appeals held that the doctrine of equitable conversion could be applied to all other aspects in the construction *525 and operation of the will itself, but could not be applied to permit an executor to collect commissions on unsold real property on the theory that it was personal property. In re Estate of Salomon, 252 N.Y. at 385. Although the Court of Appeals found that the will implicitly had vested the executors with the power to sell the real property for purposes of paying the legacies and distributing the estate, that power was never exercised, and the testator's real estate remained unsold real property and was not commissionable. New York State courts have subsequently and consistently held, except in isolated instances, [14] that no commissions will be paid to executors unless there is in fact a sale of the real property. In re Estate of Saphir, 343 N.Y.S.2d at 26 and cases cited thereat.
*526 The Saphir opinion contains an excellent exposition of the history and application of the New York State law. That opinion further supports the contention that executor's commissions for the decedent's real property should be denied in this case. In Saphir, one-third of the estate's assets was placed in trust for the benefit of the widow, remainder to their son, and the residue was placed in trust for the son until he reached a specified age. The major asset of the estate was certain income-producing realty which the executor-trustee administered. When the residuary trust terminated, the son petitioned the court to have the realty turned over to him for management since he owned two-thirds outright and had a remainder interest in the remaining third. The widow consented. The court ordered the transfer. The executor sought commissions on the value of the realty conveyed pursuant to court order. The surrogate's court held that this transfer did not constitute an exception to the general rule and that the executor had not received and distributed the property within the meaning of section 2307 of the New York Surrogate's Court Procedure Act. The case at hand is not *527 distinguishable in any material respect from Saphir. In both cases, the executor did not make any transfer to himself as trustee, although he had been managing the property. The trustee in Saphir took title to the realty for trust purposes, but, as executor, he did nothing except permit the property to vest in himself as trustee pursuant to the terms of the will. In the case at hand, the decedent devised her real property outright (i.e., not in trust) to her grandchildren, reserving a life estate for her son John. She indicated in her will that she wanted her trustees, in their widest discretion, to make full and absolute provision for her son John. The decedent named Gartland and the Dutchess Bank and Trust Company as her executors and trustees. As the will contest appeared to be continuing for an extended period of time, Clarke, a vice president and trust officer of the Dutchess Bank and Trust Company, undertook to manage and maintain the decedent's real property and continued to do so until settlement of the will contest. [15] Although we do not agree with respondent's suggestion that the beneficiaries under the 1978 will (i.e., the decedent's minor grandchildren and *528 her mentally incompetent son) were capable of undertaking these duties themselves, their guardians could have done so. As noted earlier, it is not clear in what capacity Clarke undertook these duties or under what authority. See supra notes 9, 15. The executor ultimately transferred the real property, by executor's deeds, to Sheila and David in accordance with the agreement settling the will contest, as approved by the Surrogate's Court. New York State surrogate's courts have on a few occasions departed from the general rule that denies commissions on unsold real estate. See supra note 14. In In re Estate of Tucker, 75 Misc.2d 318, 347 N.Y.S.2d 845 (Surr. Ct. N.Y. Co. 1973), *529 the New York County Surrogate's Court discussed some of the fundamental principles governing fiduciary compensation in the State of New York. The surrogate's court noted that real property usually passes directly to a devisee by virtue of the terms of the will and does not ordinarily form part of the body of property which is administered by an executor. In re Estate of Tucker, 347 N.Y.S.2d at 847. The surrogate's court stated that many of the cases disallowing executor's commissions for such transfers of real property cite the principle that title passes directly from the testator to the devisee without any act on the part of the executor, and hence, the executor did not "receive" the property within the meaning of the commission statute, "but the real basis of the decisions is that the executor performed no act in relation to the realty under authority given to him by the will or under general rules of law". Id.[16] Based on an analogy to specifically devised properties other than real estate and on deemed sales of real estate, the surrogate's court in Tucker allowed executor's commissions on unsold real estate. *530 The following year, in In re Estate of Driver, 77 Misc.2d 664, 354 N.Y.S.2d 381 (Surr. Ct. N.Y. Co. 1974), the same New York County Surrogate's Court upheld the general rule of In re Estate of Salomon, supra, and distinguished its decision in In re Estate of Tucker. The surrogate's court stated that it allowed commissions in Tucker, not because the executors had undertaken to manage the property, but because they were required to take executorial action under the will in allocating the real property between two trusts: The executors in that case did not just permit the property to vest in the trustee pursuant to the terms of the will as here but made the determination to distribute the property in kind so that it could be held for its investment value, rather than to sell it and use the proceeds to satisfy the balance of debts, expenses and the funding of the trust.
In re Estate of Driver, 354 N.Y.S.2d at 382. We do not think that the actions of Clarke (the Dutchess Bank and Trust Company or later the Bank of New York) as executor *531 fall into any purported exceptions to the general rule. The executor did not "receive" the real property ultimately transferred to Sheila and David, within the meaning of section 2307(2) of the Surrogate's Court Procedure Act and the cases interpreting the same. Although the property did not pass as specifically devised in the 1978 will, the executor nevertheless did not have authority under the will to receive the real property and perform executorial acts in relation thereto; this power, if it existed at all, was reserved to the trustees for the benefit of John. Moreover, we think that, if a New York State appellate court were reviewing this case, it would conclude that no exception to the general rule has been shown in this case: the executor did not actually sell the real property nor was it an extraordinary situation in which the equivalent of a "sale" occurred or needed to be constructed. The real estate in this case was merely conveyed by executor's deeds to Sheila and David in accordance with the agreement settling the will contest. The executor performed no executorial duties with respect to this real estate. Under New York State law, it is only when "money" is received, *532 distributed, or delivered by the executor that the executor is entitled to commissions thereon. We hold, therefore, that the executor in this case did not "receive, distribute, or deliver" the real property or proceeds thereof within the meaning of section 2307 of the New York Surrogate's Court Procedure Act and is not entitled to receiving or paying commissions for the transfer of the real property. Respondent argues that since the executor was not entitled under New York State law to commissions on unsold real property, the Court should sustain respondent's determination allowing only $ 5,000 in executor's commissions. That, however, does not follow logically. The only objection raised by respondent to executor's commissions was this matter of the unsold real property. However, the real property in the estate accounted for only $ 626,840 of the total receipts of $ 2,590,566.10 for purposes of computing the receiving commissions. Similarly, the real property accounted for only $ 626,840 of the total payments of $ 2,585,868.12 for purposes of computing the paying commissions. Based upon this Court's calculations, [17] the executor's commissions attributable solely to the decedent's *533 real property for receiving is $ 6,359.08 and for paying is $ 6,370.83. Therefore, having decided that the real property is not includable for purposes of computing the executor's commissions under New York State law, we hold that executor's commissions to the extent of $ 12,729.91 ($ 6,359.08 plus $ 6,370.83) are not allowable. The remaining amount, $ 58,034.43 ($ 70,764.34 less $ 12,729.91), is allowed. Addition to Tax under Section 6651(a)(1)
Respondent has determined an addition to tax in the amount of $ 13,436 under section 6651(a)(1) for failure to timely file an estate *534 tax return. See supra note 1. Petitioner contends that the return was not timely filed due to reasonable cause. The executor of an estate has a duty to file an estate tax return within 9 months after the date of the decedent's death. Sec. 6075(a). If the executor is unable to make a complete return, he or she shall supply all of the information available at that time. Sec. 6018. An extension of up to 6 months to file a return may be granted by respondent if the executor is unable to file a reasonably complete return and has provided good and sufficient cause. Sec. 6081; sec. 20.6081-1(a), Estate Tax Regs. If a return is not timely filed, section 6651(a) provides: (a) Addition to the Tax. -- In case of failure -- (1) to file any return * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during *535 which such failure continues, not exceeding 25 percent in the aggregate; * * *
Under this section, absent a showing of reasonable cause and no willful neglect, an addition to tax for late filing is imposed. To avoid liability for this addition to tax, the taxpayer bears the burden of proving both that the failure to timely file was not due to willful neglect and that the failure was due to reasonable cause. Sec. 6651(a)(1); Rule 142(a). Reasonable cause is defined as the exercise of ordinary business care and prudence that still renders one unable to timely file a return. Estate of Vriniotis v. Commissioner, 79 T.C. 298, 310 (1982); Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Willful neglect is viewed as a conscious, intentional failure or reckless indifference to the obligation to file. United States v. Boyle, 469 U.S. 241, 245 (1985). Whether petitioner has sufficiently shown reasonable cause and no willful neglect is a question of fact to be decided on the entire record. Estate of Duttenhofer v. Commissioner, 49 T.C. 200, 204 (1967), affd. 410 F.2d 302 (6th Cir. 1969). *536 Petitioner first contends that it reasonably relied on the advice of its attorney not to timely file its return. Petitioner cites United States v. Boyle, supra at 250, to support the proposition that reasonable cause may be found to exist when a taxpayer reasonably relies upon the advice of an attorney or accountant that it was unnecessary to file a return on the due date, even if the advice was mistaken. Petitioner also cites Estate of DiPalma v. Commissioner, 71 T.C. 324, 327 (1978), for this same proposition. We think that petitioner has misconstrued the holdings of those cases. The Supreme Court in Boyle held that a taxpayer's reliance on the advice of an attorney concerning matters of law constitutes reasonable cause because "Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney". United States v. Boyle, supra at 251. However, the Supreme Court further stated that "It requires no special training or effort to ascertain a deadline and make sure that it is met" and that a taxpayer's reliance on the advice of an attorney with *537 respect to matters such as meeting filing deadlines generally does not constitute reasonable cause. Id. The case of Estate of DiPalma v. Commissioner, supra, involved an unusual situation in which the executrix, a housewife married for 45 years and with no business experience, was led by the estate's attorney to believe that the pending estate dispute justified the delay in the filing of the return. This Court found that: The executrix did not sit supinely by and leave everything to [the attorney]. She made inquiry of him. * * * Inexperienced as she was in such matters, we think that she was justified in relying on her belief, albeit that such belief was, in point of fact, erroneous.
Estate of DiPalma v. Commissioner, supra at 327. Petitioner also discusses the three categories of cases that address the issue of whether reliance on an attorney or other expert constitutes reasonable cause for failure to timely file an estate tax return. See Estate of LaMeres v. Commissioner, 98 T.C. 294, 315-319 (1992). The first category of cases involves taxpayers who claim that they *538 relied on an expert's advice concerning filing requirements. In those cases, courts found either that no advice had been given upon which the taxpayer could rely or that the taxpayer was not reasonable in relying upon the advice given. 98 T.C. at 315-316. The second category of cases, like the first, does not involve erroneous advice that a tax return does not need to be filed, but instead, that an addition to tax would not be owing even if a required return was not timely filed. 98 T.C. at 316. The third category of cases involves situations in which reasonable cause for late filing was found. In such cases, it was found that the taxpayer "made full disclosure to the expert, that the taxpayer relied in good faith on the expert's advice, and that the taxpayer did not otherwise know that the return was due". 98 T.C. at 317. Two subcategories exist in the third category: the first involves expert advice that no tax return was required at all (for example, an attorney's advice with respect to a legal question of whether a tax return needs to be filed at all), and the second involves late filings due *539 to erroneous expert advice as to the date the law requires the taxpayer to file a return. 98 T.C. at 317. Petitioner categorizes its case in the third category: reasonable reliance on the legal advice of an expert constituting reasonable cause for late filing. We disagree. Petitioner's case most closely falls within the second category: * * * the expert did not tell the taxpayers that they were not required to file a return or give erroneous advice concerning the proper filing date. Instead, the expert told the taxpayers that no addition to tax would be owing even if a required return was not timely filed * * *.
Estate of LaMeres v. Commissioner, 98 T.C. at 316. Petitioner's argument is perhaps another subcategory of category 2. In Estate of LaMeres v. Commissioner, 98 T.C. at 316, this Court stated that the second category involves erroneous expert advice that no additions to tax would be due because no tax liability existed. In this case, Gartland's erroneous advice did not involve the estate's tax liability. Gartland knew that the estate tax and interest thereon for the *540 late payment would have to be paid. He still advised that the addition to tax (penalty) for late filing of the return would be waived and would not be owing because of what he perceived as extenuating circumstances. We do not think that petitioner can argue that Clarke, a vice president and trust officer of the Dutchess Bank and Trust Company, reasonably relied on the advice of attorney Gartland. Gartland and Clarke were both serving as preliminary co-executors throughout the will contest and at the time the return was due, and Gartland subsequently assisted in the preparation of the estate tax return. Gartland was experienced in probate and estate tax matters. See supra note 4. He was aware, well before the filing deadline, that an estate tax return had to be filed. Gartland's testimony also revealed that he was well aware that an addition to tax is imposed for late filing, although he insisted that, in extenuating circumstances similar to this case, respondent waives that addition. See, however, supra note 11. Gartland erroneously concluded that the estate could file the estate tax return in an untimely manner and that the addition to tax for late filing would be *541 waived by respondent because the will contest was still pending and there were no funds available for the payment of the tax owing. We do not think that petitioner relied on this advice; also we do not think that petitioner's reliance, if any, on this erroneous advice constitutes reasonable cause to avoid the addition to tax for late filing. We conclude that this case closely resembles the situation found in Estate of Mayer v. Commissioner, 351 F.2d 617 (2d Cir. 1965), affg. 43 T.C. 403 (1964). We held that reasonable cause did not exist for the late filing of an estate tax return where the executor was a certified public accountant, familiar with Federal and State income taxes and aware of the time for filing the estate tax return, and who had retained an attorney with experience in the preparation of estate tax returns to assist him in his duties as an executor. The Court of Appeals for the Second Circuit affirmed this Court's decision in that case. Petitioner also contends that the substantive bases for Gartland's erroneous advice constitute reasonable cause for the late filing. Petitioner asserts that, due to the *542 unique nature of the structure of the estate and the pending will contest, it was uncertain whether Gartland and Clarke were the fiduciaries required to file the return (rather than the Bank of New York, the inter vivos trustee and the executor under the 1961 will). Petitioner further points out that the Bank of New York, not Gartland and Clarke, had control of the bulk of the decedent's assets and was unwilling to release them for payment of taxes until after settlement of the will contest. None of these contentions demonstrates that petitioner had reasonable cause to fail to timely file the estate tax return in this case. Petitioner first argues that, during the will contest, it was not clear who should file the estate tax return because the decedent's inter vivos trust provided that all tax liabilities arising from the death of the decedent, whether attributable to the assets of the trust or assets passing through the probate estate, were to be paid by the inter vivos trustee rather than by the executor of the estate. Thus, petitioner states that this uncertainty of who should file the estate tax return [18] and the personal liability that attaches to such a filing (presumably *543 under New York State law and not the Federal tax law) led Gartland and Clarke reasonably to decide not to timely file the return. Section 6012(b)(1) states that "If an individual is deceased, the return of such individual * * * shall be made by his executor, administrator, or other person charged with the property of such decedent." Gartland and Clarke requested that they be appointed the estate's preliminary executors during the pendency of the will contest. They obtained preliminary letters testamentary specifically for the purpose of arranging to pay the estate's current obligations and marshalling and preserving the assets of the estate, including the care of the real property. Thus, Gartland and Clarke were authorized to act as the preliminary executors of the estate during the pendency of the will contest. *544 They certainly undertook such duties in receiving, maintaining, and distributing property for which the executor sought commissions from the date of death through 1991, so it stands to reason that the preliminary executors also should have undertaken to timely file the estate tax return as mandated by section 6075(a). The uncertainties as to the identities of the beneficiaries and the fiduciaries under the first or second will would have no bearing on the amount of the gross estate or the estate tax owing by the estate. The uncertainties as to the will contest, which may or may not have affected who would ultimately bear the economic burden of that tax, are not in and of themselves reasonable cause to delay filing of the estate tax return. Estate of Duttenhofer v. Commissioner, 49 T.C. 200, 206 (1967), affd. per curiam 410 F.2d 302 (6th Cir. 1969). Petitioner also contends that Gartland and Clarke reasonably concluded that they would not file a return on the due date because there was no money with which to pay the taxes owed and because the Bank of New York would not release any of the decedent's trust assets. Petitioner *545 is attempting to merge two independent duties, the duty to timely file an estate tax return and the duty to pay the tax owing. The inability to pay the tax owing is not reasonable cause for not timely filing the tax return itself. Estate of Young v. Commissioner, T.C. Memo. 1983-686. [19] Petitioner's inability to obtain assets from the Bank of New York in order to pay the tax due may have been sufficient reasonable cause to obtain an extension of time to pay but does not constitute sufficient reasonable cause to have failed to timely file the estate tax return or to request an extension of time to file. *546 Petitioner has not shown that its failure to timely file an estate tax return was due to reasonable cause. In October of 1985, before the return was due, the Bank of New York had provided Clarke with a list of the estate's assets and their values as of the date of the decedent's death. In addition, in February of 1986, an appraisal of the decedent's real and personal property had been completed. Even if all of this information was not sufficient to file a complete return, an executor is "required to file * * * [a] return based on the best information available and then file a later amended return if necessary." Estate of Vriniotis v. Commissioner, 79 T.C. at 311; sec. 20.6018-2, Estate Tax Regs. Petitioner has not shown that Gartland and Clarke did not possess or could not have gathered sufficient information to file a timely estate tax return or at least to request an extension of time within which to file. We do not find that the various rationales presented by petitioner for its failure to timely file the estate tax return in this case or to request an extension of time to file rise to the level of "reasonable cause". Therefore, we sustain *547 respondent's determination of an addition to tax under section 6651(a). Based on concessions and the foregoing holdings, Decision will be entered under Rule 155. Footnotes
1. In the notice of deficiency, respondent determined that the amount of the addition to tax under sec. 6651(a)(1) was $ 140,051, less the amount of $ 126,615 previously assessed, resulting in an increase of $ 13,436.↩
2. Petitioner has conceded respondent's disallowance of accountant fees in the amount of $ 3,500 and partial disallowance of miscellaneous expenses in the amount of $ 1,327. The parties have stipulated that petitioner is entitled to a deduction for attorneys' fees in the amount allowed by the New York State Surrogate's Court of Dutchess County and paid by the estate, but such amount is not to exceed $ 49,500. The amount actually allowed by the Surrogate's Court in its Decree of Final Judicial Settlement, filed and entered on May 1, 1992, was $ 50,000. Petitioner agrees that, pursuant to the stipulation, the amount of $ 49,500 should be allowed as a deduction. Whether these attorneys' fees have actually been paid by the estate can be verified in the Rule 155 proceedings.↩
3. Certain provisions had been made in the original trust agreement for Sheila Traver's then husband, Michael Gerard Hartigan Moloney, which were omitted in the 1973 amendment. New provisions were made for David Melville, his new wife, and their descendants, as well as certain other adjustments in the operation of the trust.↩
4. John J. Gartland, Jr. is an attorney who was admitted to the practice of law in 1939. A significant portion of his practice is devoted to estate and probate work, including estate taxation. Gartland first met the decedent in 1971 or 1972 when he handled some real estate matters for her.↩
5. The decedent indicated in Article Six of her 1978 will that: I anticipate that my said son, JOHN WILLIAM MELVILLE will not at any time during his life be in a position to be self-supporting and therefore it is my desire in this Article SIXTH together with the provisions of Article SECOND and THIRD to make full and absolute provision for his maintenance, education, comfort, best interest and welfare and I request that my Trustees consider this objective as paramount and controlling in exercising the discretion conferred upon them by this Article to make distribution of income and principal. I recognize that changing conditions cannot be foreseen by me and I therefore confer upon my Trustees the widest discretion to meet such changing conditions and to carry out my wishes as I have herein expressed them.↩
6. In fact, the conservators continued in that capacity until January 9, 1990, when their final accounting was approved by the Order Settling Final Account, entered by Justice Louis C. Palella of the New York State Supreme Court.↩
7. The decedent's total real property consisted of three parcels, totaling 86.8 acres. The first parcel consisted of 27.9 acres of land, on which was situated a colonial-style residence (Parcel 1). Parcel 1 was located on the north side of Melville Road. The second parcel consisted of 49.1 acres of rolling farmland (Parcel 2). Parcel 2 was located on the south side of Melville Road. The third parcel was located adjacent to and south of Parcel 2 and consisted of 9.8 acres (Parcel 3).↩
8. Parcel 1 (including the residence) was valued at the total amount of $ 451,700, Parcel 2 was valued at $ 147,300, and Parcel 3 was valued at $ 27,840.↩
9. Since Clarke was a vice president and trust officer of the Dutchess Bank and Trust Company and since the Dutchess Bank and Trust Company was both a conservator and a designated coexecutor and cotrustee under the 1978 will, it is not entirely clear as to the capacity in which Clarke was acting at various times.↩
10. On the videotape, when the decedent was asked why she was making changes in the disposition of her assets, she stated that she would rather not make any comment and that they (presumably David and Sheila) would know why. Senator Rolison indicated to the guardian ad litem appointed to protect the interests of one of the decedent's grandchildren in the proceeding that the decedent may have made such a comment because she hated David and Sheila for bringing the conservatorship proceeding against her and that the decedent found it very painful to talk about David and Sheila in her later years. The decedent's housekeeper also indicated that the decedent stated that she had changed her will and intended to punish David and Sheila. Apparently David and Sheila first learned of the 1978 will and codicil after the decedent's death.↩
11. Gartland testified that he had been involved in two proceedings in which one income tax return and one estate tax return had been filed late, and the additions to tax for late filing had been waived by respondent. Gartland's testimony in this case as to his advice to Clarke about such waivers seems to differ somewhat from his earlier written statement. In a letter dated September 21, 1989, Gartland, then no longer an executor of the estate, wrote to Vincent Pangia, the accountant for the estate, as follows: At this conference [about 6 or 7 months after the decedent's death] with Mr. Clarke, he stated there was no money available to make any deposit for any taxes and it would have to await a determination by the court on the probate of a Will, whether first or second. I stated to Mr. Clarke that it was useless to file a tax proceeding on an estimated basis since different assets would be included in the estate, depending on which will was ultimately probated. Furthermore, no money was available to pay taxes. Later, when a Will was probated, and an Executor appointed, it would have to file a tax proceeding, both federal and state, and pay the tax. I also advised him that there was no way to eliminate interest on any taxes due, and that interest would have to be paid. At the time, I was so occupied in trying to get the second Will admitted to probate that I gave no thought to any penalty ever being charged under these circumstances. In hindsight, I probably was incorrect in that we should have filed some type of proceeding or ask for some type of an extension. Unfortunately, I did not so advise Dutchess Bank. In my 50 years of practicing law, I handled over 100 cases of a Federal Tax return, and never have been penalized before. I never thought of a penalty.↩
12. On April 24, 1986, the due date of the estate tax return, respondent had assessed a late filing addition to tax in the amount of $ 113,953.50. On June 13, 1988, respondent abated that late filing addition.↩
13. The two figures for Sheila ($ 74,610 + $ 377,090) added up to the appraised date-of-death value of Parcel 1; i.e., $ 451,700. The $ 175,140 figure for David was the appraised date-of-death values of Parcels 2 and 3 ($ 147,300 + $ 27,840). See supra↩ notes 7, 8.
14. See, for example, In re Estate of Tucker, 75 Misc.2d 318, 347 N.Y.S.2d 845 (Surr. Ct. N.Y. Co. 1973); compare In re Estate of Saphir, 73 Misc.2d 907, 343 N.Y.S.2d 20 (Surr. Ct. Kings Co. 1973) and In re Estate of Driver, 77 Misc.2d 664, 354 N.Y.S.2d 381 (Surr. Ct. N.Y. Co. 1974). None of these surrogate's court opinions was appealed and subjected to appellate scrutiny. However, Tucker↩ appears to be an aberration from the general rule, which is either narrowly confined to its own peculiar facts or is an erroneous application of the New York State law.
15. We note that Clarke's management of the real estate in this case was rather minimal. Also since Clarke used the cash flow from the inter vivos trust for these purposes, commissions would have already been computed on that cash flow. All of the principal and income from the inter vivos trust was included in the receipts and payments in the executor's account of proceedings.↩
16. The surrogate's court also noted that New York State courts have allowed commissions based upon the subject matter of specifically devised property whenever the will required executorial action with respect to that specific property: "the test is whether the will requires performance of regular executorial duties with respect to the property specifically bequeathed". In re Estate of Tucker, 75 Misc.2d 318, 347 N.Y.S.2d 845, 848 (Surr. Ct. N.Y. Co. 1973), citing numerous cases involving property other than real estate. The surrogate's court in Tucker further noted that there had also been a few cases that allowed commissions on unsold realty, based upon the same ground as the cases addressing specific legacies. In re Estate of Condax, 11 Misc.2d 819, 173 N.Y.S.2d 108 (Surr. Ct. N.Y. Co. 1958); In re Estate of Robords, 69 Misc. 2d 1026, 332 N.Y.S.2d 698 (Surr. Ct. Broome Co. 1972) (in both cases, the surrogate's court held that a "sale" had taken place when one of the residuary legatees in effect had purchased the real property with the proceeds of his distributive share); In re Estate of Kennedy, 133 Misc. 904, 234 N.Y.S. 734↩ (Surr. Ct. Saratoga Co. 1929). In each case, the court found (implicitly or explicitly) that the executor had "received and distributed" the real property.
17. We removed the real estate from the "back end" of the computations of the executor's commissions. Therefore, the receiving commission claimed for the real estate is $ 5,905.66 (1% of $ 590,566.10) plus $ 453.42 (1 1/4% of $ 36,273.90 which is $ 626,840 less $ 590,566.10) or $ 6,359.08. The paying commission is $ 5,858.68 (1% of $ 585,868.12) plus $ 512.15 (1 1/4% of $ 40,971.88 which is $ 626,840 less $ 585,868.12) or $ 6,370.83.↩
18. Gartland's testimony at trial, however, reveals that he recognized that the Bank of New York's obligation to pay the tax liabilities did not necessarily mean it had the obligation to file the return.↩
19. In Estate of Young v. Commissioner, T.C. Memo. 1983-686↩, we discussed the independent operations of the Internal Revenue Code sections governing the duties to file and to pay and requests of extensions of time to fulfill those duties. For example, section 20.6161-1(c)(3), Estate Tax Regs., provides that "The granting of an extension of time for paying the tax will not relieve the executor from the duty of filing the return on or before the date provided for in [section] 20.6075-1".